James **HIRST**, et al.,
Plaintiffs-Appellants,

v.

Jean **GERTZEN**, et al.,
Defendants-Appellees.

No. 78–2889.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 4, 1980.

Decided May 10, 1982.

---

**3.** *See discussion* in *United States v. Vargas*, 615 F.2d 952, 959–60 (2d Cir. 1980).

Kent A. Russell, San Francisco, Cal., for plaintiffs-appellants.

* Honorable Walter E. Hoffman, Senior United States District Judge, District of Virginia, sitting by designation.

1. Glacier County and the City of Cutbank were dismissed from the lawsuit on the authority of

John D. Stephenson, Jr., Jardine, Stephenson, Blewett & Weaver, James R. Walsh, Smith, Emmons, Baillie & Walsh, Great Falls, Mont., for defendants-appellees.

Before ALARCON and CANBY, Circuit Judges and HOFFMAN *, District Judge.

ALARCON, Circuit Judge:

## FACTS

In the early morning of March 7, 1975, Clayton Hirst, a member of the Blackfeet Native American Tribe, was found dead in his jail cell in the Glacier County Jail in Cut Bank, Montana, hanged by the neck from his belt. Appellants, the heirs of Clayton Hirst, brought suit under 42 U.S.C. § 1983, charging that Glacier County, the City of Cut Bank, and various county and city officials had violated his civil rights.

Appellants put forward two theories of liability for Clayton Hirst's death. First, appellants alleged that Clayton Hirst had been murdered by electrocution, and his body hanged afterwards to disguise the murder. The murder allegedly spawned a conspiracy among county and city officials to suppress the true facts of Hirst's death. Alternatively, appellants claimed that Clayton Hirst had committed suicide, and that his suicide was the direct and foreseeable result of the defendants' gross negligence in leaving Clayton Hirst in the sole control of a violent deputy sheriff, employed by the defendants despite a history of violent behavior towards prisoners. In connection with their § 1983 claim based on gross negligence, appellants requested the district court to take pendent jurisdiction over a related state law claim based on simple negligence.[1]

*Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The effect of the Supreme

On the day set for jury selection, appellants filed a motion challenging the jury panel, claiming that the jury selection procedure employed in the district court invidiously discriminated against Native Americans. The court, after a hearing, found no evidence of intentional discrimination in the selection procedure, and denied appellants' motion.

Over appellants' strenuous objections, the court divided the trial into two phases. The manner of Clayton Hirst's death was to be determined in the trial's first phase; in the second phase, any remaining issues would be decided.

The jury found that Clayton Hirst had committed suicide.

After the jury's verdict was returned, the court requested appellants to make an offer of proof on their claim that the gross negligence of the defendants was responsible for Clayton Hirst's suicide. Appellants offered to prove the following facts in support of that claim:

1. County officials were grossly negligent in hiring the deputy sheriff. This deputy had a long history of violence towards minority prisoners, and had been dismissed from his previous job as a deputy sheriff because of his abuse of prisoners.

2. Responsible county officials either failed to inquire as to the deputy's competence when they hired him, or showed deliberate indifference to his obvious unsuitability for the position.[2]

3. Once county officials had hired the deputy they were grossly negligent in continuing to employ him as a guard, and in giving him sole and unsupervised control of the jail.

4. During his tenure as a deputy sheriff for Glacier County, the deputy had abused prisoners within his charge.

5. On one occasion the deputy had allegedly taunted prisoners committed to his supervision.

6. On another occasion, Hirst's older brother James had been incarcerated in the city jail. The deputy, while employed by the county, had stripped James Hirst, sprayed him with mace, and left him in an unventilated cell where he would have suffocated to death had another deputy not happened upon him.

7. County officials were on notice of the deputy's violent behavior. Law enforcement personnel in the county were informed of the mace incident.

8. Nothing was done to investigate the maceing incident or to reprimand the deputy for his behavior.[3]

9. The afternoon before his death, Hirst, a cheerful person with no history of depression or mental illness, was visibly upset and apparently in fear of his life.

10. At the time of his death, Hirst was the only prisoner in the jail, alone on the second floor of the prison structure, isolated from the police dispatcher and other prison personnel on the first floor.

11. The deputy had been alone with Hirst at some point on the afternoon Hirst died, and the deputy at all times had access to the second floor of the prison.

12. Despite Hirst's troubled mental state, and his subjugation to a deputy with known sadistic tendencies, Hirst was allowed by

---

Court's partial overruling of *Monroe* in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), is discussed *infra*.

**2.** A common law action for negligent hiring is recognized by a majority of jurisdictions. *See generally* Comment, *Negligent Hiring—Employer Owes a Duty to the General Public to use Reasonable Care in Hiring & Retaining Employees*, 9 U.Balt.L.Rev. 435 (1980); Comment, *Negligent Hiring and Retention—Availability of Action Limited by Foreseeability Requirement*,

10 New Mex.L.Rev. 491 (1980); Restatement (Second) of Torts § 302(B), Comment (e) (1965).

**3.** Appellants did not specifically name the county law enforcement personnel who were informed of this incident. However, appellants were prevented from developing this information further, since the district court precluded them from introducing evidence regarding the incident.

prison officials to retain his belt, in violation of the prison's own policies.[4]

The court, after hearing the offer of proof, ruled that the proposed evidence did not establish a *prima facie* case of gross negligence. The court dismissed appellants' § 1983 action and the pendent state claim.

Appellants contend that the court erred in dismissing their § 1983 action and the pendent state law claim, and argue that the court abused its discretion in bifurcating the trial. Appellants also assert that their evidence established a *prima facie* case of intentional racial discrimination in the juror selection process, and that the district court was incorrect in finding otherwise.

For the reasons stated below, we hold that appellants' offer of proof sufficiently established a *prima facie* case of negligence under § 1983 and we reverse the court's dismissal of appellants' § 1983 action. We further hold that the court did not abuse its discretion in bifurcating the trial, and that the court correctly concluded that appellants' evidence failed to establish a *prima facie* case of intentional racial discrimination in the juror selection process. We remand the question of the court's pendent jurisdiction over the state law claim for reconsideration in light of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

4. Appellants also claim that the deputy resigned shortly after Clayton Hirst died, and suggest that his letter of resignation, dated before Hirst's death, was an after-the-fact fabrication. Appellants claim that four months after Hirst died, the deputy was hospitalized for a heart attack brought about by "stress, nervousness, worrying and anxiety."

5. Appellants, as Native Americans, clearly have standing to challenge the constitutionality of the juror selection plan on equal protection grounds. *See generally Carter v. Jury Comm'n*, 396 U.S. 320, 329–30, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970); *McGinnis v. M. I. Harris, Inc.*, 486 F.Supp. 750, 755 n.4 (N.D.Tex. 1980). Native Americans constitute a distinct or identifiable group for purposes of making an equal protection challenge to the Plan. *United States v. Hanson*, 472 F.Supp. 1049, 1055 (D.Minn.1979). *See United States v. Brady*, 579 F.2d 1121, 1131 (9th Cir.), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979)

## THE JURY CHALLENGE

■ Appellants allege that the entire procedure used in the Great Falls District to select petit jurors invidiously discriminated against Native Americans, in violation of the equal protection principles embodied in the due process clause of the fifth amendment.[5]

The panel of 60 persons from which the jury in this case was drawn was chosen according to the Revised Plan for Random Jury Selection of the District Court for the District of Montana ["The Plan"].[6] In conformity with the plan's requirements, the court clerk selected, at random, the names of 1,000 potential jurors from the voters registration list for the Great Falls District. Juror qualification questionnaires were sent to 300 persons whose names were selected at random in a public drawing from the 1,000 names on the master jury list. As required by statute,[7] the juror questionnaire requested the prospective juror to identify his or her race; thus, the race of the prospective juror was clearly displayed on most of the returned questionnaires. Persons who failed to respond to the initial mailing were sent a follow-up questionnaire. If the prospective juror failed to return the second questionnaire, no further attempts were made to contact that person, although the plan did require that further steps be taken.[8] Ultimately, 287 of the 300

(Native Americans constitute a cognizable group for purposes of a "fair cross section" challenge to the Montana jury selection plan). *See generally Hernandez v. Texas*, 347 U.S. 475, 478–80, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1954).

6. This plan has been specifically approved by the Ninth Circuit. *See United States v. Brady*, 579 F.2d 1121, 1133 (9th Cir. 1978).

7. 28 U.S.C. § 1869(h).

8. The plan provides that persons who fail to return the questionnaires within ten days shall be summoned by the Clerk to appear personally at the Clerk's Office to complete the questionnaire. Plan, ¶ 13b. The Deputy Clerk also indicated that where the first mailing was returned as undeliverable, the Clerk's Office made attempts to obtain a new address, and sent a second questionnaire to the new address if it could be determined.

persons completed and returned questionnaires. Because of a realignment of the geographical boundaries of the Great Falls division, 112 additional returned questionnaires from another geographical area were added. All told, 399 persons returned questionnaires, 19 of whom (4.76 percent) identified themselves as Native Americans.[9] The district court took judicial notice of the fact that Native Americans constituted 6.36 percent of the population in the district.

Almost 50 percent of the 399 persons returning questionnaires availed themselves of excuses from jury service available under the jury selection plan; 14 of the 19 persons identifying themselves as Native Americans were among those excused. Among the exemptions available upon request was one for those living 100 miles or more from the courthouse. The record contains no evidence as to the number or race of the persons excused from jury service on the basis of the 100 mile exemption.[10]

Of the 200 persons remaining in the jury pool after those requesting excuses were eliminated, only five persons (2.5 percent) remained who identified themselves as Native Americans. None of the 60 persons on the jury panel from which the Hirst jury was chosen were Native Americans. Mary Kendall, an activist in the Native American community, testified that she could recall only one Native American ever being called to serve on a Great Falls federal jury, despite her personal acquaintance with over 5,000 Native Americans of voting age.

Appellants claim that these facts established a *prima facie* case of intentional racial discrimination in the juror selection process, shifting the burden of proving non-discrimination to the defendants. Appellants' claim rests on two alternative theories. First, appellants contend that the jury selection process resulted in the "pro-

gressive decimation" of the number of Native Americans available for jury service: Despite a Native American population of 6.36 percent in the District, at most only 5.26 percent of the persons returning juror questionnaires were Native Americans, and only 2.5 percent of the persons remaining on the jury venire from which petit juries were chosen were Native Americans. We are told that this "progressive decimation" must be viewed in light of the fact that the race of each prospective juror was clearly displayed on the face of the returned questionnaires, affording those who granted exemptions a "clear opportunity to discriminate" against Native Americans.[11] According to appellants, the "progressive decimation" of Native Americans available for jury service, coupled with the 'clear opportunity to discriminate' provided by the designation of race on the questionnaire, establishes a *prima facie* case of racial discrimination in the juror selection process. Appellants cite *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), in support of their position.

Alternatively, appellants contend that the totality of circumstances in this case, including the availability of the 100 mile exemption, the testimony of Mary Kendall, and the Clerk's failure to summon non-responding jurors, suggests that the jury selection plan was either consciously designed or administered so as to decrease substantially the number of Native American citizens available for jury service. Appellants argue that the totality of these circumstances is sufficient to establish a *prima facie* case of intentional discrimination.

In our view, appellants' evidence does not establish a *prima facie* case of intentional racial discrimination under either theory.

---

**9.** Counsel's affidavit indicated that 19 of the persons (4.76 percent) returning questionnaires identified themselves as Native Americans, and that two others had Native American surnames. If these two additional persons are included in the total 21 of the returned questionnaires (5.26 percent) were from Native Americans.

**10.** Most of the statistical data referred to here was contained in affidavits submitted by defense counsel. The actual returned questionnaires were never introduced into evidence.

**11.** Appellants thus suggest that the exemptions were granted in a racially biased manner, designed to eliminate a disproportionate number of Native Americans from the jury venire.

Our analysis of appellants' contention begins with a recognition that a state may not deliberately and systematically exclude members of an identifiable group from participation as jurors in the administration of justice. *Alexander v. Louisiana*, 405 U.S. 625, 628–29, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972). *See Whitus v. Georgia*, 385 U.S. 545, 549–50, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967); *Hernandez v. Texas*, 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954).[12] Similarly, substantial *underrepresentation* of an identifiable group is constitutionally impermissible under equal protection principles when it results from purposeful discrimination.[13] *Castaneda v. Partida*, 430 U.S. 482, 493, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977); *Alexander v. Louisiana*, 405 U.S. at 629–31, 92 S.Ct. at 1224–25.

For purposes of discussing appellants' first theory, we assume that the numbers of Native Americans available for jury service in this particular instance *decreased significantly* after excuses from jury service

had been granted.[14] It is also true that the race of each prospective juror was clearly in evidence on the returned questionnaires. However, we disagree with appellants' suggestion that the mere susceptibility of a selection procedure to abuse, even where accompanied by evidence that a given group is substantially underrepresented on a single venire, establishes a *prima facie* case of intentional discrimination as a matter of law.

The elements of proof required to establish a *prima facie* case of intentional racial discrimination in the juror selection process turn of necessity on the circumstances of each case. *See Alexander v. Louisiana*, 405 U.S. 625, 626, 629, 92 S.Ct. 1221, 1222, 1223, 1224, 31 L.Ed.2d 536 (1976). The proportion of an identifiable group eliminated from the pool of eligible jurors, along with the susceptibility of the selection process to abuse, are surely important factors in this determination. Indeed, the substantial underrepresentation or the complete exclusion of an identifiable group,

**12.** Virtually all of the relevant Supreme Court cases have involved challenges by *criminal* defendants to the composition of juries or grand juries. Neither party suggests that a different standard for assessing claims of intentional racial discrimination is appropriate where the jury is challenged in a civil case.

**13.** The same constitutional analysis is applicable to cases brought under the Equal Protection Clause of the Fourteenth Amendment and to cases brought under the equal protection principles of the Fifth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228 n.2, 43 L.Ed.2d 514 (1975). Similarly, equal protection challenges to the composition of grand juries and petit juries are governed by the same principles. *Alexander v. Louisiana*, 405 U.S. 625, 626 n.3, 92 S.Ct. 1221, 1223 n.3, 31 L.Ed.2d 536 (1972).

**14.** If the percentage of Native Americans in the relevant geographical area (6.36 percent) is compared with the percentage of Native Americans remaining on the jury venire after juror excuses were granted (2.5 percent) there is a differential of 3.86 percent. This method of calculating the percentage difference is often referred to as the absolute disparity method of computation. If we look instead to the percentage by which the probability of serving as a juror is reduced for Native Americans after juror excuses are granted, Native Americans are underrepresented on the jury venire by 60

percent. *See Berry v. Cooper*, 577 F.2d 322, 326 n.11 (5th Cir. 1978). Where the cognizable group involved in the jury challenge represents a small percentage of the population, the second method of comparison is the more informative. Since the group in question makes up a relatively small percentage of the population, the "absolute" disparity between the percentage of the group in the population and the percentage on the jury venire will always be small, even where the group has essentially been eliminated during the selection process. Our circuit has introduced a third measure of comparison, which considers the effect of the underrepresentation on the actual numerical composition of the jury. *United States v. Armstrong*, 621 F.2d 951, 955–6 (9th Cir. 1980); *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1977). The Supreme Court has also suggested that analysis of the standard deviation is an appropriate way of determining whether the underrepresentation of a given group is significant. In our view, this method would have been an appropriate method of determining the significance of the degree of underrepresentation evidenced here. *See Castaneda v. Partida*, 430 U.S. 482, 496–7 n.17, 97 S.Ct. 1272, 1281–82 n.17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311–12 n.17, 97 S.Ct. 2736, 2743–44 n.17, 53 L.Ed.2d 768 (1977).

coupled with a juror selection procedure susceptible of abuse, has been held to establish a *prima facie* case in cases where intentional discrimination could not otherwise be demonstrated. *See, e.g., Whitus v. Georgia,* 385 U.S. 545, 550–51, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967); *Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1954); *Avery v. Georgia,* 345 U.S. 559, 561–63, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244 (1953). In *Hernandez v. Texas,* for example,[15] jurors were selected by "key men" who utilized such subjective criteria as "good moral character" in selecting jurors. In *Alexander, Avery,* and *Whitus,* juror selection at certain crucial points was purportedly done in a random fashion. However, in the plans challenged in these cases, the names of jurors were selected from cards which were color-coded according to the race of the person named on the card,[16] from segregated tax roles,[17] or from questionnaires bearing an "information card" clearly designating the juror's race.[18] In each of these cases, proof of the substantial underrepresentation or exclusion of an identifiable group, along with evidence that the juror selection system was susceptible of abuse, was sufficient to establish a *prima facie* case of racial discrimination. The minimal evidentiary requirements approved in these cases, in our view, reflect judicial recognition that the *actual* intrusion of racial bias in those particular juror selection systems was virtually incapable of further proof, short of an open admission of discrimination by those involved in the selection process. It would have been virtually impossible, for example, for the challengers to have produced further evidence that an allegedly random selection process was not random but was in fact distorted by racial prejudice, or that the "key men" actually ignored the quality of "good moral character" in chosing jurors, and instead selected only white jurors for racial reasons.[19]

These cases, however, do not support appellant's much broader claim that the mere susceptibility of a system to abuse, along with a single instance of substantial underrepresentation on a jury venire, establishes a *prima facie* case of intentional discrimination as a matter of law. In our view, whether *further* evidence of intentional discrimination is required depends in large part upon such crucial considerations as the difficulty of proving that bias had intruded into a particular selection procedure. *See generally Hernandez v. Texas,* 347 U.S. at 481–82, 74 S.Ct. at 671–72. Different juror selection systems are susceptible to covert abuse in varying degrees: a system in which jury commissioners select jurors on the basis of such vague and non-quantifiable attributes as "good moral character" is obviously more easily abused with impunity than a selection method in which objective selection criteria are mechanically applied.

■ The proof problems faced by the challengers in the cases discussed above are clearly absent in this case. Appellants here suggest that intentional racial discrimination intruded at the point in the selection process when juror excuses were granted. This claim can easily be documented from information contained in the returned questionnaires, which list not only the race of the prospective juror, but also any excuses from jury service requested by a prospective juror, and any excuses granted.[20] Tab-

---

**15.** 347 U.S. 475, 478–9 (1954); *Akins v. Texas,* 325 U.S. 398, 402–04, 65 S.Ct. 1276, 1278–79, 89 L.Ed. 1692 (1945); *Smith v. Texas,* 311 U.S. 128, 130–31, 61 S.Ct. 164, 165–66, 85 L.Ed. 84 (1940).

**16.** *Avery v. Georgia,* 345 U.S. 559, 560–61, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953).

**17.** *Whitus v. Georgia,* 385 U.S. 545, 548–9, 87 S.Ct. 643, 645–46, 17 L.Ed.2d 599 (1967).

**18.** *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

**19.** *See Hernandez v. Texas,* 347 U.S. at 481–2, 74 S.Ct. at 671–72, *quoting Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). *See Alexander v. Louisiana,* 405 U.S. at 630, 92 S.Ct. at 1225.

**20.** Plan, ¶ 13(b), 14(a). The names and addresses of the 300 prospective jurors to whom questionnaires are sent are also compiled in an alphabetical list by the court clerk, which also includes a space to indicate whether each such person is eventually found to be qualified, excused, etc. Plan, ¶ 13(a), ¶ 14(b).

ulation of the data contained in those and related documents, all available for appellants' inspection upon appropriate motion,[21] could easily have disclosed any possible pattern of racial bias in the granting of excuses from jury service. At the point in the selection process where requested excusals were granted, jurors in the plan were not selected at random, nor were they selected according to subjective criteria. They were culled from those returning juror questionnaires by a mechanical, non-discretionary process of granting the requested excuses listed on the juror questionnaire. *See United States v. Hanson*, 472 F.Supp. 1049, 1055 (D.Minn.1979). Here, unlike the cases cited by appellants, the claim of racial bias can easily be supported by further evidence.[22] Thus, a mere showing of underrepresentation in this case, even when coupled with evidence that the juror selection procedure was susceptible of abuse, is insufficient to establish a *prima facie* case of intentional discrimination.[23]

■ Appellants' second theory fares no better. It is true that an invidiously discriminatory purpose in juror selection may often be inferred from the totality of relevant circumstances. *See Washington v. Davis*, 426 U.S. 229, 249, 96 S.Ct. 2040, 2052, 48 L.Ed.2d 597 (1976). Here, however, the district court found that the evidence simply did not support a finding of intentional discrimination. We must uphold that factual finding so long as it is not clearly erroneous. *United States v. Smith*, 625 F.2d 278, 279–80 (9th Cir. 1980). As discussed above, the underrepresentation of Native Americans on the jury venire, along with the fact that the prospective juror's race was clearly designated on the returned questionnaires, was insufficient to establish a *prima facie* case of intentional racial bias. The district court's conclusion that the additional evidence introduced by appellants did not provide legally significant support for their contention was not clearly erroneous. Appellants point out that the court clerk failed to summon jurors who did not respond to the questionnaire as he was required to do by the Plan. Appellants introduced no evidence concerning the race of the persons failing to respond, however, nor did they introduce any proof from which it could be inferred that such persons were likely to be Native Americans.[24] Similarly, appellants suggest that the availability of an exemption for those living over 100 miles from the courthouse was designed virtually to guarantee that a disproportionate number of Native Americans would request exemptions from jury service, since the major reservations were all located over 100 miles from the courthouse. Appellants introduced no evidence, however, other than counsel's unsupported assertion, that the majority of Native Americans lived over

21. *See* 28 U.S.C. § 1867(f); Plan, ¶ 13(a), ¶ 24. Moreover, all pertinent documents are retained by the clerk for a period of four years after the last person qualified for jury service has been excused. Plan, ¶¶ 7, 14(c).

22. Requiring further evidence in such cases, while adding little to the challenger's burden, might also assist in eliminating unfounded claims of intentional racial discrimination. We note that in this case appellants would have to inspect, at most, 400 questionnaires to obtain the pertinent information. *Cf. Preston v. Mandeville*, 428 F.2d 1392, 1393–94 (5th Cir. 1970) (scientific sampling method used where master jury roll prohibitively large).

23. As noted earlier, the Jury Systems Improvement Act of 1978 itself (28 U.S.C. § 1861 *et seq.*) requires that the juror qualification form used in selecting federal juries elicit the race of the prospective juror, a requirement which, according to appellants makes the federal jury

selection system "susceptible of abuse." Were we to adopt appellants' position, proof that an identifiable group was substantially underrepresented on a single federal jury venire would, without more, establish a *prima facie* case of intentional racial discrimination. Such a result *seems unreasonable, and might unnecessarily* encourage frivolous jury challenges. We note that it is open to challengers to establish a *prima facie* case of intentional discrimination by showing that significant underrepresentation of an identifiable group occurred in a series of jury venires. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

24. *Cf. Berry v. Cooper*, 577 F.2d 322, 325–26 (5th Cir. 1978) (the record in that case established that 65 percent of the undeliverable questionnaires were sent to black persons and 54 percent of the unreturned questionnaires were addressed to black persons).

100 miles from the courthouse, or that Native Americans did in fact avail themselves of this exemption in disproportionate numbers.[25] Finally, appellants' failure to lay a proper foundation for the testimony of Mary Kendall may have substantially undermined any value her testimony might otherwise have had. Appellants never established, for example, (1) whether Mary Kendall had actually inquired of the 5,000 Native American persons known to her if they had served on a federal jury; (2) whether any of those persons had been sent questionnaires but had requested excuses; (3) whether she had personal knowledge that these 5,000 persons presently lived in the district; (4) whether these persons were otherwise fully qualified to serve as jurors. Her testimony may simply have been too conclusory and vague to add any weight to appellants' attempt to establish a *prima facie* case. There were thus ample grounds upon which the district court based its conclusion that appellants had failed to establish a *prima facie* case of intentional racial discrimination. We uphold the district court's denial of appellants' motion.

### The Bifurcation Order

■ Over appellants' objections, the district court divided the trial into two phases. In the first phase, the jury was to determine only the manner of Clayton Hirst's death, whether by electrocution or by self-inflicted hanging. The evidence was to be confined to the issue of how Clayton Hirst met his death. The issues remaining after the jury's verdict were to be tried in the trial's second phase, before the same jury. This bifurcation was within the sound dis-

cretion of the district court. We must uphold the court's decision absent an abuse of discretion. *Moss v. Associated Transport, Inc.*, 344 F.2d 23, 25–26 (6th Cir. 1965); *See Richmond v. Weiner*, 353 F.2d 41, 44–45 (9th Cir.), *cert. denied*, 384 U.S. 928, 86 S.Ct. 1447, 16 L.Ed.2d 531 (1966).

The court bifurcated the trial for a number of reasons. First, bifurcation simplified the issues for the jury. If the jury were to find that Clayton Hirst was electrocuted, the appellants' claim that certain officials conspired to cover up the murder could be considered in the trial's second phase. Conversely, the complex conspiracy issue would be eliminated if the jury found that Clayton Hirst died by self-inflicted hanging. Secondly, the court feared that unless the trial was conducted in this order, there was danger of unnecessary jury confusion, since certain evidence relevant to the conspiracy issue might tend to obscure the more fundamental question of how Clayton Hirst's death occurred.

While conceding that the trial court has broad discretion to order bifurcation in appropriate circumstances, appellants claim that the bifurcation order here emasculated their proof on a crucial issue—namely, the identity of the murderer of Clayton Hirst. Appellants suggest that the deputy in charge of the jail's prisoners at the time Clayton Hirst died, was the person who murdered Clayton Hirst. The evidence which appellants wished to introduce consisted primarily of testimony about this deputy's violent and brutal conduct towards Native American persons on previous occasions.[26]

---

25. We therefore have no occasion to pass on the significance, if any, of appellants' claim that Native Americans use the 100-mile exemption in disproportionately large numbers, and that the availability of the 100-mile exemption was a significant cause of reducing the number of Native Americans available for jury service. The disproportionate utilization of juror excuses by a given group may have clear importance where the sixth amendment's fair cross-section requirement is involved. *See Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

26. Appellants assert that they were barred from introducing the following evidence in the trial's first phase:

1. While Sheriff of Toole County, the deputy came into a bar and alleged that a person named Klang had been using profanity against him. The deputy violently subdued Klang with the aid of four or five other persons and then took him to the County jail facility where he was submitted to further beatings which caused permanent paralysis. Klang's father pursued legal action through the county attorney. However, the case was eventually dis-

In our view, appellants' dispute is not primarily with the court's bifurcation order; it is with the court's evidentiary ruling barring testimony about the deputy's prior acts. As we note below, the disputed evidence may be admissible in any retrial to establish appellants' claim of negligence. However, the court's ruling excluding the disputed evidence in the trial's first phase for the purposes for which appellants offered it was correct.

Evidence of prior acts is ordinarily not admissible to prove that a person acted in a particular way on a particular occasion. Fed.R.Evid. 404(b). Rule 404(b) does provide, however, that evidence of prior acts is admissible to prove *identity* where identity is in issue. The parties here agree that the identity of the alleged murderer of Clayton Hirst was a material issue in the case.

The "identity" exception to Rule 404(b) must be applied with care, however, since too broad an application might allow into evidence the very matter which the general rule excludes—*i.e.*, character evidence. *See Wright and Graham*, 22 *Federal Practice and Procedure* § 5246 (1978). For that reason, courts have traditionally taken a narrow view of the "identity" exception to § 404(b). *See, e.g., United States v. Webb*, 466 F.2d 1352 (9th Cir. 1972).

The relevance of the deputy's prior acts of violence to the identity of the murderer apparently rests on a "modus operandi" theory. The deputy's prior acts allegedly demonstrate a unique method of operation, from which a jury could infer that the deputy was indeed the murderer of Clayton Hirst. None of the proffered evidence, however, involved taking a prisoner's life. While the evidence, if true, suggests an extremely violent and brutal character, it does not demonstrate the unique handiwork of a murderer. Given the rather narrow construction of the "modus operandi" exception in this circuit, requiring a very close similarity between the prior acts and the conduct sought to be established, it was not an abuse of discretion for the district court to have excluded this evidence when introduced for the purpose of establishing the identity of the murderer. Even had the trial not been bifurcated, the evidence would not have been admissible for that purpose.

### Dismissal of the § 1983 Action Based on Gross Negligence

Appellants argue that the district court erred in dismissing their § 1983 claim. The district court found, as a matter of law, that the evidence contained in appellants' offer of proof would not establish a claim under § 1983 premised on gross negligence.[27]

---

missed when the District Attorney's office allowed the applicable statute to run on the case.

2. An Indian named Marion Selway was subjected to an illegal arrest by the deputy, was put in a car and beaten so seriously that he was "bleeding internally and externally for days", and then left to die on a roadway. A civil rights complaint against the deputy was filed concerning this incident but was never acted upon. The offer of proof does not indicate when this incident took place.

3. Approximately three years before the death of Clayton Hirst, James Hirst, the older brother of Clayton, was incarcerated in the Cut Bank jail. During his daily contact with the deputy, the deputy continually sneaked into the cell area without warning and taunted the prisoner, trying to provoke a reaction. James Hirst attempted to escape. Hirst was apprehended, and following his capture was placed in the City jail, was stripped naked, and put in a closed cell with all ventilation shut off. The deputy then sprayed mace directly into

Hirst's face and into the unventilated cell. Had James Hirst not been rescued by another officer, he would have died of suffocation. Despite the discovery by other law enforcement officers of the deputy's activities, the deputy was kept on after this incident and was subjected to no investigation or disciplinary actions whatsoever. He continued to have free reign over the jail.

27. The Court stated:

The offer of proof is rejected then, and the Court finds, as a matter of law, that there is no such gross negligence as would lead to any kind of a conclusion of the kind of willfulness, which would constitute a violation of any of the Defendant's civil rights.

The court's order of dismissal, premised in part upon appellants' rejected offer of proof, appears to be in the nature of a grant of summary judgment. *See* Fed.R.Civ.P. 12(c), 56. *Wiltsie v. California Department of Corrections*, 406 F.2d 515, 517 (9th Cir. 1968). In

Subsequent to the time that the district court's ruling was handed down, the Supreme Court decided the case of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In *Parratt*, the Supreme Court held that negligent conduct by persons acting under color of state law may be actionable under 42 U.S.C. 1983. There is no express requirement of a particular state of mind in Section 1983. The precise holding in *Parratt* was summarized by the Court as follows:

> Accordingly, in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. 451 U.S. at 535, 101 S.Ct. at 1913.

The complaint here clearly alleges that the actions were taken under color of state law and that there was a deprivation of life. We are, therefore, compelled to remand this matter for trial consistent with the views expressed in *Parratt*. We recognize that appellants' complaint alleges that defendants were grossly negligent. The pleadings were drafted prior to *Parratt* and at a time when it was reasonable to believe that the law required something more than simple negligence to state a claim under section 1983. The trial of this matter upon remand must be according to the law as interpreted by the court in *Parratt*.

We are satisfied that the complaint and the offer of proof made a sufficient showing of causation.

■■■ The hiring and supervision of those with primary control of prisoners is a serious matter, demanding a high degree of care.[28] *Cf. Rundle v. Madigan*, 356 F.Supp. 1048, 1053 (N.D.Cal.1972) (delegating authority to wield and discharge a firearm demands a high degree of care). Appellants' offer of proof outlined a systematic failure on the part of the relevant county officials to exercise even minimal care in the hiring and supervision of the deputy in charge of prisoners at the Glacier County Jail.

■■■ Appellees' duty to protect Hirst from unreasonable risks of harm was uncontroverted. Appellants' offer of proof, in our view, was sufficient to allege a triable issue that the county defendants' conduct in hiring and supervising their deputies was negligent and created a foreseeable risk that a violation of Hirst's civil rights would occur, and in fact proximately caused his death. *Redmond v. Baxley*, 475 F.Supp. 1111, 1116 (E.D.Mich.1979); *Leite v. City of Providence*, 463 F.Supp. 585, 589–91 (D.R.I. 1978). *See Owens v. Haas*, 601 F.2d 1242 (2d Cir. 1979); *Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974); *Mayes v. Elrod*, 470 F.Supp. 1188, 1192–95 (N.D.Ill.1979). *See also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). It is true, of course, that a trial of these issues may show that the proof does not support these allegations. Appellants are entitled to present their proof to a trier of fact.

## DISMISSAL OF APPELLANTS' PENDENT STATE LAW CLAIMS

The district court took pendent jurisdiction over a state law claim for simple negligence brought by appellants against various county and city employees. At the close of trial, however, the district court dismissed the state law claim, holding that the court

reviewing a grant of summary judgment, all inferences must be drawn in the light most favorable to the party opposing the motion. *Spectrum Financial Co. v. Marconsult, Inc.*, 608 F.2d 377, 380 (9th Cir.), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980).

**28.** Montana recognizes that a jailer owes a common-law duty to a prisoner to keep him safe and protect him from unnecessary harm.

*Pretty on Top v. City of Hardin*, Mont., 597 P.2d 58, 60–61 (1979). *See also* Mont. Code Annotated Title 7, Ch. 32, part 21, §§ 2104, 2107 (1979); Mont. Code Annotated Title 45, Ch. 5, part 2, § 204 (1979). As a necessary corollary of that common law duty, relevant county officials have a duty to staff the county jail with properly hired, trained, and supervised personnel.

had no jurisdiction to consider it. While the court's ruling was correct at the time it was entered, subsequent changes in the relevant law require that the pendent law issue be remanded for reassessment.

The original complaint filed in the district court named Glacier County and the City of Cut Bank as defendants. Toward the beginning of the litigation, the district court dismissed them from the lawsuit. At the time these entities were dismissed, case law clearly held that the city and county could not be sued under § 1983. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Appellants' pendent state law claim thus included only the individual persons named as defendants.

Under Montana law, however, the governmental entity which employs an alleged tortfeasor—in this case the city and the county—is deemed an indispensable party in any negligence action brought against an employee.[29] As noted above, these entities had already been dismissed from the lawsuit. Because the district court had no independent basis of federal jurisdiction over these entities under applicable precedent the district court also had no jurisdiction over them for purposes of the pendent state

law claim. *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). Because the court had no jurisdiction over indispensable parties to the state law claim, it was compelled to dismiss that claim. *See Teamsters Union v. Morton*, 377 U.S. 252, 257, 84 S.Ct. 1253, 1257, 12 L.Ed.2d 280 (1964).

After the city and the county had been dismissed, the Supreme Court decided *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* held that local governmental entities may in fact be sued under § 1983 where the alleged deprivation of constitutional rights resulted from the execution of an official governmental policy or custom. *Id.* at 690, 98 S.Ct. at 2035. Because we must decide this case on the basis of the law as it exists at the time of the appeal, *Cort v. Ash*, 422 U.S. 66, 76–77, 95 S.Ct. 2080, 2086–87, 45 L.Ed.2d 26 (1975), we hold that the dismissal of the city and the county must be reversed.[30]

Under *Monell*, the city and county would be amenable to suit under § 1983 for a deprivation of Clayton Hirst's

**29.** Mont. Codes Annotated Title 2, Ch. 9, part 3, § 305 (1979), provides in relevant part:

(2) In an action brought against an employee of a state, county, city, town, or other governmental entity for a negligent act, error or omission or other actionable conduct of the employee committed while acting within the course and scope of his office or employment, the governmental entity employer shall *be made a party defendant to the action.*
(3) Recovery against a governmental entity under the provisions of [this act] shall constitute a complete bar to any action or recovery of damages by the claimant, by reason of the same subject matter, against the employee whose negligence or wrongful act, error, or omission or other actionable conduct gave rise to the claim. In any such action against a governmental entity, the employee whose conduct gave rise to the suit shall be immune from suit by reason of the same subject matter if the governmental entity acknowledges or is bound by a judicial determination that the conduct upon which the claim is brought arises out of the course and scope of such employees' employment, unless the claim is based upon an intentional tort or felonious act of the employee.

(4) In any action in which a governmental entity employee is a party defendant, the employee shall be indemnified by the governmental entity employer for any money judgments or legal expenses to which he may be subject as a result of the suit unless the conduct upon which the claim is brought did not arise out of the course and scope of his employment or is an intentional tort or felonious act of the employee.

**30.** The individual defendants employed by the City of Cut Bank had been dismissed from the case on the ground that they had no duty to manage the county jail. On the record before us, we cannot determine whether appellants' remaining negligence claim involves some showing that the City of Cut Bank afforded the county deputy involved here with ready access to Hirst while he was incarcerated in the city jail for four days before his transfer to the county jail. If the appellants' claim does not in fact implicate the city in any way in Hirst's suicide, the district court should dismiss the city and the individual defendants employed by the city from the case. Since the record before us is inconclusive on this matter, we remand it to the district court for determination.

constitutional rights if that deprivation resulted from official policy, practice or custom.[31] *See Mayes v. Elrod*, 470 F.Supp. 1188, 1192–95 (N.D.Ill.1979). We cannot ascertain from the state of the record whether this is in fact the case, since the city and the county were dismissed at an early stage in the litigation. On remand, the appellants should at least be given the opportunity to amend the pleadings and to show that their remaining claim or claims against these entities is cognizable under § 1983 in light of the *Monell* decision.

If appellants' claim or claims against the city and the county do in fact rest on some official policy, practice, or custom of those entities, these entities will be a proper defendant in appellants' § 1983 action. The district court will also have jurisdiction over appellants' state law claim, since there will be federal jurisdiction over all indispensable parties to the state law cause of action. We express no opinion as to how the district court should exercise its discretion in determining the appropriateness of assuming pendent jurisdiction over the state law negligence claim. We merely remand that question for reassessment in light of the *Monell* decision.

Because we affirm the district court's ruling on the bifurcation and juror selection questions, we conclude that the jury's verdict in the trial's first phase should not be disturbed. On remand, the jury should be instructed that Clayton Hirst committed suicide.[32] Evidence relating solely to the electrocution/hanging controversy, or to other matters eliminated from the case by the

jury's verdict, may properly be excluded from the trial.

AFFIRMED in part; REVERSED and REMANDED in part.

WALTER E. HOFFMAN, Senior District Judge, Sitting by Designation, dissenting in part:

A relatively simple factual case has been rendered exceedingly complex by the majority opinion. The net effect of the reversal is tantamount to a direction for the lower Court to let the plaintiff recover, at least insofar as the unidentified deputy sheriff is concerned. Because the issue of causation is vital on the facts presented, and it clearly appears from the sworn testimony of every witness that the deputy sheriff was not at the county jail after 4:30 p. m. on March 6, 1975, until 8:00 a. m. on March 7, 1975, during which time Clayton Hirst committed suicide by hanging himself in his cell by the use of his belt, I respectfully dissent.

Whether the Supreme Court did, or did not, permit the recovery on simple negligence in actions under § 1983, under the recent case of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), is not material in this case. The crucial question is dependent upon the part a certain deputy sheriff played in handling Clayton Hirst.

Hirst was apparently arrested on an excessive drinking charge[1] and was initially placed in the Cut Bank jail. About noon on March 5, 1975, the chief of police of the City

---

**31.** The original complaint filed by appellants in this action sufficiently alleged a claim against the county under § 1983. Both the original and amended complaints alleged that the actions complained of were done under color of the customs and practices of Glacier County, and that the defendants, acting under color of those customs and practices, deprived Clayton Hirst of his constitutional rights. The only elements which must be alleged to establish a claim for damages are that the conduct complained of was engaged in under color of state law and that it deprived the plaintiff's decedent of the rights, privileges, and immunities secured by the Constitution. *See Morrison v. Jones*, 607 F.2d 1269, 1275–76 (9th Cir.), *cert.*

*denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). *See generally Spence v. Staras*, 507 F.2d 554, 557 (7th Cir. 1974); *Wagar v. Hasenkrug*, 486 F.Supp. 47, 53–54 (D.Mont. 1980).

**32.** The trial's second phase need not be heard by the same jury which heard the trial's first phase.

**1.** The amended complaint alleges that Hirst was arrested on February 28, 1975 by Cut Bank police on a charge of excessive drinking, and was transferred to the Glacier County jail on March 5, 1975 to be held on a charge of burglary and/or malicious mischief.

of Cut Bank took Hirst to the Glacier County jail, where he was booked (apparently by the alleged sadistic deputy sheriff) and placed in a cell on the second floor. At the time of booking another officer was present. About 1:00 p. m., the sheriff (a female) took Hirst before a justice of the peace in the adjoining courthouse for a brief hearing. He was then returned to his cell. Contrary to the usual practice Hirst was permitted to retain his clothes he was wearing, including his belt which was not noticed as Hirst was wearing a T-shirt outside his trousers, because Hirst advised that his sister, Carol, was getting bond money and he would be released shortly.

According to Carol Hirst Shields, then Carol Hirst Allison and the sister of Clayton Hirst, the sheriff telephoned her after her brother had been transferred to the Glacier County jail. The sheriff turned the phone over to Clayton Hirst and Carol advised her brother that she had made arrangements for a bond to be posted, but the father had to go get the money. Carol related that Clayton was "very upset" and, when told that she would get the money in the morning, Clayton replied, "Don't worry", and that his voice sounded "scared" and "upset". This is the only possible evidence from which anyone could conclude that he was "apparently in fear of his life" as related by the majority opinion, although not stated in this manner in the offer of proof. All other uncontradicted testimony was to the effect that Clayton Hirst was completely normal in his words and actions during all times he was seen alive in jail. All persons having any contact with Clayton Hirst during the brief period of his jail confinement were called as witnesses in the bifurcated trial, essentially all of whom were called by counsel for the plaintiff. No single witness placed the alleged sadistic deputy sheriff in the jail area at any time between 4:30 p. m. on March 6, 1975 and 2:15 a. m. on March 7, 1975, at which time Hirst's body was discovered in his jail cell.

The majority opinion fails to mention the fact that the so-called sadistic deputy sheriff had gone home at 4:30 p. m. and did not return until 8:00 a. m. the next morning to work his regular 8:00 a. m. to 4:00 p. m. shift. Had the sworn testimony indicated any evidence pointing to the deputy sheriff's presence at or near the jail area during the crucial period, I would concede that there is a basis for reversal. However, the majority feels that merely because this particular deputy sheriff had a key to enter the jail area—although only one key was available to actually get into the cell area on the second floor and this key was located in a counter drawer in the dispatcher's office—this evidence was sufficient to infer that the deputy sheriff in question may have entered the premises on the night of March 6 and, unnoticed by the dispatcher who was the only person on duty, the alleged sadistic deputy sheriff took the key from the counter drawer, went to the second floor, thereafter either murdered Hirst or so taunted him to the point that Hirst committed suicide. Of course, the majority now approves of the jury finding that Hirst committed suicide and, therefore, the issue would be whether the alleged sadistic deputy sheriff so threatened or taunted Hirst that Hirst took his own life.

Nor does the majority opinion reflect that the uncontradicted evidence reveals that, after the purported sadistic deputy sheriff had left the jail area between 4:00 and 4:30 p. m., following the completion of his duty shift, the last person who saw Hirst alive was Deputy Sheriff Koepke (admittedly not the same deputy sheriff whose prior acts and conduct are the subject of the majority opinion) when he went to Hirst's cell to retrieve the dinner dishes following Hirst's final meal and, in compliance with Hirst's request, brought him a deck of cards and a book.[2] Koepke left the jail area immediate-

---

**2.** Either shortly before or while Hirst was eating his dinner, Hirst was visited by two attorneys, one of whom represented Hirst on the City of Cut Bank charge, the other represented him on the state charge of burglary and/or malicious mischief. The Glacier County attorney testified that Hirst appeared to be in good spirits and discussed at length with the attorney the merits of his defense to the more serious charge. The attorneys left at approximate-

ly thereafter and, from that time until the body was discovered, the only persons in the jail were two female dispatchers, Stephanie Cunningham who worked the 4:00 p. m. to midnight shift, and Michaela Bogie who went on duty at midnight and, at approximately 2:15 a. m., not having heard anything from Hirst by the monitor which would pick up any noise in Hirst's cell, called Wayne Higgins, a police officer of the City of Cut Bank, with a request that he check the cell.[3] It was Higgins[4] who discovered the body and cut it down.

The district court dismissed the action as alleged in Count II of the amended complaint as to the defendants, Moore, Frisbee, Bruch, Higgins, Bogie and Cunningham, by order entered on January 11, 1977. This Count, according to the majority opinion, has apparently reinstated the above named defendants despite the fact that at least some of these defendants could not possibly have had anything to do with the case unless a conspiracy had been shown—an

allegation which was settled by the jury verdict.

On February 8, 1978, the trial court approved an extensive final pretrial conference order, same having been prepared and signed by counsel. It is interesting to note that, assuming decedent committed suicide by hanging, plaintiffs' only contention as to liability is C(1)(b) which reads:

"Gross negligence amounting to willful and wanton misconduct by defendants in failing to adequately safeguard and preserve the life of Clayton Hirst."

Further, under paragraph 8 of plaintiffs' contentions, it is said:

"Actions taken and not taken by defendants in this case to safeguard the life of Clayton Hirst fell below the applicable standard of care in this locality for the administration of jail facilities"

At no time, in the pleadings or otherwise, has there been any contention that the alleged sadistic deputy sheriff ever directly threatened or taunted Clayton Hirst. The offer of proof as to the prior acts of this

---

ly the time that Deputy Sheriff Koepke arrived to pick up Hirst's dinner dishes.

**3.** In light of *Parratt v. Taylor, supra,* assuming that only simple negligence is all that is required in a § 1983 action, I could be persuaded that there was a showing of *prima facie* negligence on the part of the dispatchers who conceded that it was customary to check the prisoner, through the use of the monitor, after approximately two to three hours of not having heard from him. It is true that the dispatchers were handicapped by reason of the installation of a new heating system which, initially at least, caused a banging or clanging of the piping system, but dispatcher Cunningham conceded that she made no effort to check on Hirst from the time the dinner dishes were retrieved by Deputy Sheriff Koepke until she was relieved at midnight by dispatcher Bogie.

Similarly, in light of *Parratt,* the fact that Hirst was not issued coveralls, the usual clothing for an inmate, and was obviously permitted to retain a belt, may possibly present a *prima facie* case of simple negligence against certain parties, as well as Glacier County if the practice was adopted by the County, who permitted Hirst to retain his clothing. This could include the alleged sadistic deputy sheriff as he was the booking officer at the time Hirst arrived at the Glacier County jail.

These concessions, however, are not sufficient for the majority. They would insist upon the receipt of proof of the prior sadistic acts of

the deputy sheriff who, except for his booking activities, had nothing more to do with Hirst's death than any member of this panel.

I am particularly concerned that the majority's reversal will create undue expense for certain defendants who obviously have nothing to do with the case. There were 14 defendants named in the original complaint. The trial court dismissed the County of Glacier, the City of Cut Bank, the State of Montana, and the Attorney General of Montana. Permission to appeal from the interlocutory order was denied by the Ninth Circuit on July 13, 1976. The amended complaint names 10 defendants and the majority opinion reinstates plaintiffs' claims against the County of Glacier and the City of Cut Bank. In accepting the jury verdict that Hirst committed suicide, this should have eliminated several of the now 12 remaining defendants as several were charged only as to participants in a conspiracy in hiding the fact that Hirst had been electrocuted—a fact now disproved by the jury verdict. I deplore the handling of the appeal in this manner, thereby causing defendants to incur additional expense.

**4.** Higgins is an enrolled member of the Blackfoot Tribe of Indians; the same Tribe to which Hirst belonged. Higgins is a named defendant in the amended complaint which alleges broad conclusory allegations of discrimination against members of the Blackfoot Tribe.

deputy sheriff does include an allegation that this party had mistreated James Hirst, the older brother of Clayton Hirst, on one occasion approximately 3 years prior to Clayton's death. While there is no evidence that Clayton learned of this episode, it is not unlikely that he became aware of it. In any event, the majority would now permit evidence of this prior incident, together with others, in an attempt to show the psychological effect upon Clayton Hirst when he realized that he was confined to a jail which was under at least partial control of this same sadistic deputy sheriff. This is the only possible nexus, not otherwise covered by the evidence of all witnesses, between that particular deputy sheriff and Hirst's death.

Stated in a somewhat different manner, the question is whether a § 1983 defendant can be held liable merely because an employee, admittedly with a prior alleged history of improper actions, is retained in employment status by the employer when there is no showing that, on all pertinent occasions, the employee either treated the prisoner improperly or otherwise was present when the prisoner sustained his injury or death. In my judgment to hold a defendant liable under this extreme psychic reasoning goes too far. The majority apparently rests its holding on the theory, not with a shred of evidence to support it factually, that a "systematic failure on the part of the relevant county officials to exercise even minimal care in the hiring and supervision of the deputy in charge of prisoners at the Glacier County Jail." Once again, if there existed even a slim reed of evidence to tie the alleged sadistic deputy sheriff to the incident involving Hirst taking his own life, I would not disagree with the fundamental principle that there does exist a duty of reasonable care and reasonable supervision of employees charged with the custodial duties of inmates in a jail. But all of the sworn testimony points conclusively to the fact that the particular deputy sheriff last saw Hirst shortly after 4:00 p. m. when he went to the second floor to bring Hirst downstairs to answer the telephone, and Hirst was thereafter fed his evening meal by Deputy Sheriff Koepke. Unwilling as I am to permit a recovery based upon a psychic theory that the alleged sadistic deputy sheriff's mere employment at the jail caused, directly or indirectly, the tragic death of Clayton Hirst by Hirst's own act of self-destruction, it is wholly immaterial as to whether isolated prior acts of the same deputy sheriff could, or could not, be shown. Not only is it immaterial but it is highly prejudicial to the rights of all remaining defendants.

The majority argues that evidence of the prior acts of the deputy sheriff is admissible under Rule 404(b), Fed.R.Evid., for the purpose of proving "identity" where identity is in issue. In the present case I am at a loss to determine any remaining issue of "identity". Everyone concedes that the facts as related in the offer of proof pertain to the alleged sadistic deputy sheriff. As stated by the late Chief Judge John J. Parker, in *Lovely v. United States*, 169 F.2d 386, 390 (4th Cir.), *cert. denied* 338 U.S. 834, 70 S.Ct. 38, 94 L.Ed. 508 (1949), a criminal prosecution:

> Equally specious is the contention that the evidence was admissible on the question of identity. The question in the case is not who ravished the prosecutrix but whether or not she had been ravished at all. The fact that the accused had denied in his statement to the F.B.I. that he ravished her, did not justify the admission of testimony that he had ravished another woman, on the theory that the prosecutrix had been ravished by an unknown person and such evidence would tend to identify the ravisher. The right of persons accused of crime to have the evidence confined to the issues on trial cannot be nullified by any such unrealistic hypothesis. It is well settled that, where identity is not in issue, it is improper to admit evidence of other crimes on the theory of proving identity. See 20 Am.Jur. p. 293 and cases cited.

From the offer of proof we must assume—although it has never been judicially or administratively decided—that the deputy sheriff in question did commit the prior acts

which admittedly would show some sadistic tendencies, especially directed toward Native Americans. But the theory of now admitting proof of these prior acts under the "identity" exception is, as Judge Parker says, an "unrealistic hypothesis." [5]

The majority agrees that the "identity" exception to Rule 404(b) must be applied with care, as otherwise the evidence will reach the very matter which the general rule excludes, i.e., character evidence. The majority upholds the trial court's exclusion of this evidence as to the identity of the contended murderer in the bifurcated trial, but then concludes that it is admissible in any further proceeding to establish gross negligence (or, of course, simple negligence) in ascertaining whether the county officials neglected their duty in hiring and supervising the same deputy sheriff, and in proving that such negligence proximately caused the death of Clayton Hirst. Such a ruling deprives the trial court of its discretion under Rule 403, F.R.Evid., even if such testimony could possibly be considered as relevant, as the probative value of such evidence, even if established, is substantially outweighed by the danger of unfair prejudice, and will merely lead to confuse the jurors.

The majority is in error when it states that the issue of "identity" was not presented to the jury in the first phase of the bifurcated trial. The special verdict form completed by the jury is substantially as follows:

### I.

What was the cause of Clayton Hirst's death: check (a) or (b).

(a) Electrocution

(b) Hanging

If you have checked (a), go to No. II. If you have checked (b), return your verdict.

### II.

Place an "x" next to the name(s) of the person(s), if any, who electrocuted Clayton Hirst.

| | |
|---|---|
| Jean Gertzen ____ | Bert Newman ____ |
| John P. Moore ____ | William Koepke ____ |
| Seldon S. Frisbee ____ | Wayne J. Higgins ____ |
| William Riddle ____ | Michelle Bogie ____ |
| William Bruch ____ | Stephanie Cunningham ____ |

If you cannot identify the person(s) who electrocuted Clayton Hirst, place an "x" in this blank _____.

Since the jury arrived at the unanimous conclusion that Clayton Hirst met his death by hanging, it was unnecessary for the jury to attempt to identify any person or persons. However, to say, as the majority does, that "identity" was not involved in the first phase of the bifurcated trial is beyond my comprehension.

In upholding the trial court's discretion in bifurcating the trial, the majority states that "the complex conspiracy issue would be eliminated if the jury found that Clayton Hirst died by self-inflicted hanging". Despite this statement, all of the parties named as persons who may have been involved in the alleged electrocution of Hirst remain as defendants in this case, together with the City of Cut Bank and the County of Glacier who have been reinstated as parties defendant. Under what conceivable theory the City of Cut Bank could possibly be reinstated is beyond my comprehension.

The authorities cited by the majority relate, in the main, to cases in which motions to dismiss the complaints were either granted or denied. In each case, it was assumed or proven that the defendants participated in the physical violence of a prisoner, or were otherwise liable for independent negligence in failure to supervise or provide a proper training program which was tanta-

---

**5.** Even to the present day *Lovely v. United States, supra,* has been extensively cited. The same case was further considered on this point in subsequent proceedings. See: *Lovely v. United States,* 175 F.2d 312 (4th Cir. 1949), affirming *United States v. Lovely,* 77 F.Supp. 619 (E.D.S.C.1948), and *United States v. Lovely,* 319 F.2d 673 (4th Cir. 1963) (a proceeding under 28 U.S.C. § 2255 attacking the conviction for want of jurisdiction). It is again cited with approval, but distinguished, in *United States v. Dutsch,* 357 F.2d 331, 333 (4th Cir. 1966). The basic principle has been followed by various circuits and state court decisions since the effective date of the Federal Rules of Evidence.

mount to "gross negligence" or "deliberate indifference" to the deprivation of the particular plaintiffs' constitutional rights. *Rundle v. Madigan,* 356 F.Supp. 1048 (N.D. Cal.1972); *Owens v. Haas,* 601 F.2d 1242 (2d Cir. 1979); *Leite v. City of Providence,* 463 F.Supp. 585 (D.R.I.1978). None of these cases pertained to situations in which the facts had been established that a particular defendant did not even come near the inmate after the inmate was last observed by others in a normal condition.

The majority likewise notes that "[t]he afternoon before his death, Hirst, a cheerful person with no history of depression or mental illness, was *visibly* upset and *apparently in fear of his life.*" The emphasized words are not substantiated by this record. Deputy Sheriff Koepke and the attorneys representing Hirst on the city and state charges, were the last individuals who saw Hirst alive, and none of the foregoing testified that he was "visibly upset" and "apparently in fear of his life"; to the contrary they said that he appeared to be entirely normal and in reasonably good spirits with the belief that he would prevail on the pending charges. Only the testimony of the sister, who conversed with Hirst by telephone, tends to support the offer of proof that he was "upset", and since the sister did not see Hirst it could not have been "visibly upset". The majority opinion avoids any discussion of the facts as revealed by the extensive transcript and this is my primary complaint in that the majority disregards the complete lack of causation insofar as the alleged sadistic deputy sheriff is concerned.

As stated in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), section 1983 provides a cause of action where a person acting under color of state law "subjects, or causes to be subjected", any other person to a deprivation of rights secured by the Constitution and laws of the United States. *Id.* at 370, 96 S.Ct. at 603. *Rizzo* points out the necessity of a *causal connection* between the victims who complain of a deprivation of a right secured by the Constitution and laws and one who "subjects or causes to be subjected" the alleged victims

to such deprivation of rights in an action under § 1983. *Id.* at 371–72, 96 S.Ct. at 604–05. While *Rizzo* was essentially an injunctive proceeding, the opinion refers to the statute as imposing liability "whether in the form of payment of redressive damages or being placed under an injunction." *Id.* at 370, 96 S.Ct. at 603. The net effect of the majority opinion is to invade the principles of federalism rejected in *Rizzo,* and to invite future actions against state or local officials predicated solely upon the individual past actions of an officer, even when that officer did nothing to subject or cause to be subjected to any deprivation of rights of the alleged victim.

*Rizzo* is followed by *Monell v. New York City Dep't. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and, on the issue of causation, the court again emphasizes the fact that, absent causation, "Congress did not intend § 1983 liability to attach". To the same effect is *Redmond v. Baxley,* 475 F.Supp. 1111, 1116 (E.D.Mich. 1979), relied upon by the majority.

Even under a Montana state law claim, assuming that the trial court in the present case was in error in basing its decision on the immunity of state officials, *see Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Montana case of *Pretty On Top v. City of Hardin,* 597 P.2d 58 (Mont.1979), correctly states the law with respect to the duties of a jailer where a prisoner commits suicide. As the Montana Supreme Court said: "Absent some possible special circumstances a jailer is under no duty to prevent [the prisoner] from taking his own life". As pointed out, the contention that the security policy made it *possible* for the prisoner to take his own life is insufficient. The "special circumstances" required are such as to make it incumbent upon the jail authorities to elevate their duty of care and thereby create the possibility that the acts of the jail authorities or individuals were the proximate cause of the death. For example, a known mentally disturbed or highly nervous individual may well elevate the duty of care. But in this case, in an effort to establish

that Hirst was electrocuted, plaintiffs have conclusively shown that Hirst was a completely normal person, albeit he was disappointed when he could not be released forthwith on bail.

In the final analysis, we return to the evidentiary question as to the admissibility under Rule 404(b) of the prior acts of the alleged sadistic deputy sheriff where all of the evidence conclusively establishes that the person in question never saw Hirst after approximately 4:00 p. m. on March 6, 1975, and Hirst committed suicide at some time prior to the discovery of his body at approximately 2:15 a. m. on March 7. In my judgment, the ruling of the majority does violence to that portion of Rule 404(b) which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person *in order to show that he acted in conformity therewith*", and the rule as stated by that eminent jurist, the late Chief Judge John J. Parker, quoted *supra*, precludes the admission of such testimony.

While I do not generally approve of substituting offers of proof for the presentation of evidence, the record (1472–1473) in this case demonstrates that the evidence had been fully presented and, after the return of the verdict, the learned trial judge stated to counsel:

> THE COURT: Now, as I understand it, and you can correct me if I am in error, with a verdict which indicates that the cause of death was by self-inflicted hanging, this means that there remains, as a potential in the case, a claim that the Plaintiffs' civil rights were violated by reason of the gross negligence of the Sheriff in the maintenance of the jail and in a failure to protect Clayton Hirst.
>
> Does the Plaintiff have any other evidence that it wants to offer on that issue?
>
> MR. RUSSELL [counsel for plaintiffs]: Well, I would call attention to the earlier offers of proof that we made as to background of Mr. [name omitted in opinion] to indicate a lack of supervision and failure to discharge him.

However, in view of the findings, the factual findings, we would not be inclined to go forward solely on that basis, other than with respect to evidence as to the negligent inquiry into Mr. [name omitted in opinion] background by Miss Gertzen.

We have no other evidence of negligence to offer, other than that which has been offered already.

> THE COURT: Well, do you care to make an offer of proof as to, make it very simply as to that and I will accept that offer of proof now.
>
> MR. RUSSELL: I would incorporate the earlier offers of proof, acts of Mr. [name omitted], so I don't have to go back over them. These have been gone into in great detail. I incorporate them herein, and I would indicate that the cause of the matters that are indicated in the earlier offers of proof, we feel that Mr. [name omitted] had a record, a past record, at the time that he was in custody of Mr. Hirst that should have brought his discharge, if the Sheriff had been—if the Sheriff had lived up to the applicable standards of care as that standard would be defined in this case.
>
> Other than that, I have no offer of proof to make.
>
> THE COURT: Very well. The offer of proof is rejected then, and the Court finds as a matter of law, that there is no such gross negligence as would lead to any kind of a conclusion of the kind of willfulness, which would constitute a violation of the Defendants' (sic) civil rights.

More recent cases have done away with the state of mind requirement and, as indicated, *Parratt v. Taylor, supra*, may conceivably permit the establishment of a claim under § 1983 predicated on simple negligence but, since the other members of the panel have concluded that the collateral matters of alleged prior acts by the deputy sheriff are admissible to prove identity, I see no need to further extend this dissent.