Filed 2/2/21  Sasser v. City of Los Angeles CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| PRESCIOUS SASSER, | B295300 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC644290) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Affirmed.

Law Office of Michael J. Curls, Michael J. Curls and Nichelle D. Jones for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Scott Marcus, Chief, Civil Litigation Branch, Blithe S. Bock, Managing Assistant City Attorney, and Shaun Dabby Jacobs, Deputy City Attorney, for Defendants and Respondents.

————————————————

Officer Evan Urias suspected Kenney Watkins had a weapon and ordered him to show his hands and get on the ground.  Watkins ran away from him.  On his police motorcycle, Urias trailed about 10 feet behind Watkins, keeping pace.  Watkins slowed down and began turning towards Urias.  Watkins held two guns, one in each hand.  Watkins started to point a gun at Urias.  Urias shot Watkins to death.

Police investigating the shooting found Watkins's guns at the scene.  Both were loaded, operational, and ready to fire.

Watkins's mother sued the Los Angeles Police Department and the City of Los Angeles for her son's wrongful death.  The jury returned a defense verdict.  On appeal, Watkins's mother assigns errors and attacks the trial judge as biased.  We affirm.

I

We summarize the facts in the light favorable to the party prevailing at trial.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 (*Cassim*).)

Watkins was a car passenger on an August afternoon.  The weather was clear and warm:  about 85 degrees.

The uniformed Urias was patrolling on a police motorcycle.  In a roll call briefing, superiors instructed Urias to be alert for the type of cars commonly used in robberies, including cars with license plate violations and tinted windows.  Urias saw and began following a car with tinted windows and a missing license plate.  Watkins was a passenger in this car.  Urias turned on his red and blue lights to command the driver to stop.  The car did not stop.

Urias followed as the car made turns and then pulled over at a gas station.

Watkins got out of the car with his hands in his waistband. He put his hands under his jacket with his arms crossed in front. Despite the temperature, Watkins used a hood that concealed his face. Watkins began walking away from Urias.

Urias suspected Watkins was carrying weapons and decided to detain him. Urias drove to about eight or 10 feet behind Watkins and ordered him to stop and show his hands.

Watkins did not stop. He began running through the gas station and along the Century Boulevard sidewalk. His hands appeared to Urias to still be in his jacket, hampering his gait. Watkins looked back at Urias and kept running.

Urias radioed for backup: man with a gun.

Urias kept following Watkins on his motorcycle, staying a little behind Watkins and to his left.

Urias issued a second command: stop and get on the ground. Watkins began running full stride.

Watkins looked over his shoulder, made eye contact with Urias, and slowed his running pace. Watkins began to turn. Urias saw one gun in Watkins's left hand. Then Urias saw a second gun in Watkins's right hand.

Watkins moved the barrel of one gun towards Urias. Watkins's pivot towards Urias was about 30 to 40 degrees.

Believing Watkins was about to shoot him, Urias drew his gun and fired two rounds at the center of Watkins's abdomen. Watkins stumbled, fell, and died. The fatal bullet hit Watkins in his back and struck his heart.

The episode had unfolded quickly: about 20 seconds elapsed from when Watkins first began running to when Urias fired.

After the shooting, police picked up two guns from where Watkins fell. One was a Smith & Wesson .44 Magnum revolver. The other was a Bursa .380 semiautomatic pistol. Both were loaded. Both were operational in the sense that a bullet would fly from the barrel if you pulled the trigger. The Bursa had a safety; it was off, meaning a trigger pull would fire the gun. The revolver had no safety.

Prescious Sasser, Watkins's mother, proceeded to trial against Urias and the City of Los Angeles on a claim for wrongful death predicated on negligence and battery. We refer to the defendants collectively as the City.

The trial lawyers appeared for pretrial matters on September 17, 2018. Michael J. Curls and Nichelle Jones represented Sasser. Geoffrey Plowden was the lawyer for the City. Over Sasser's objection, the court bifurcated the trial into a liability phase and a damages phase. The court and parties selected a jury.

The trial took seven weekdays. Opening statements began on September 19, 2018. Closing arguments ended September 27, 2018. Sasser called Urias, civilian eyewitness Calvin Gatison, a coroner, and two experts in her case-in-chief. The City called two detectives, five criminalists, and two experts. It recalled the coroner.

Key facts were uncontested. Watkins ran down the street away from Urias carrying two loaded guns. Watkins had not heeded Urias's commands. There was no trial dispute on these points.

The major factual contest was what Watkins did just before his death: whether he turned his body, or just his head, towards Urias while running, and whether Watkins turned away from

4

Urias towards a driveway.  Sasser's theory was Watkins was simply fleeing when Urias unjustifiably decided to shoot him.  By contrast, the City's theme was Watkins posed a deadly threat by carrying the loaded guns, by defying police commands, and by slowing, by beginning to turn, and by starting to point a gun at Urias.

Eyewitness Calvin Gatison was driving nearby as Watkins ran down Century Boulevard.  Police interviewed Gatison shortly after the shooting.  Gatison told them Watkins was turning to his left, which would have been towards the street and Urias.  At trial, Gatison testified Watkins turned only his head, not his body, towards the officer.  Gatison testified he had never told police otherwise.  The interviewing detective, however, testified Gatison, when describing the incident, made a turning motion with his body to demonstrate Watkins had been turning his body towards Urias.

The jury reached a defense verdict on its third day of deliberations.  It found the force Urias used against Watkins was reasonable.

Sasser appeals the verdict.  She asserts four grounds: improper bifurcation; instructional error; incorrect evidentiary rulings; and permeating bias by the trial court.

We analyze these four claims.

II

We start with bifurcation.  The court bifurcated the trial into a liability phase and a damages phase.  The defense verdict on liability obviated the damages trial.

First we summarize our conclusion:  the court's bifurcation decision was sound.  It saved trial time because the liability witnesses and the damages witnesses were different:  there was

5

no overlap.  Bifurcation also focused the liability trial on the liability issue, which was what happened in the moments leading up to the shooting.  The trial court did not abuse its discretion.

Now we support our conclusion.

The City moved to bifurcate the liability and damages phases under Code of Civil Procedure sections 598 and 1048.  The City argued Sasser's "heart-wrenching testimony" would not contribute to the issue of liability—Sasser did not witness the shooting—but would tempt the jury to decide the case emotionally rather than rationally.  The City also argued bifurcation would shorten the trial, as there would be no need for evidence of Watkins's criminal past and his fraught relationship with his mother, Sasser.

Sasser opposed the bifurcation motion.

Code of Civil Procedure section 598 authorizes trial courts to order separate trials to further the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation.  Code of Civil Procedure section 1048, subdivision (b), similarly authorizes separate trials to avoid prejudice and to promote convenience or judicial economy.

These provisions give trial courts discretion to bifurcate trials.  The major goal of bifurcating a trial is to expedite and simplify the presentation of evidence.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 888.)

We review for an abuse of discretion.  (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086.)

The trial court bifurcated because "we've got a lot of testimony that's going to come in on damages that's highly disputed . . . .  [W]e've got criminal convictions, a battery

involving the mother [Sasser] apparently . . . .  [W]e've got a lot of inflammatory evidence that's going to come in on—possibly come in on impeachment of [Watkins's] mother on the damages case."  The court said it was concerned about "a whole dispute" as to the true nature of Watkins's and Sasser's relationship.

This reasoning makes sense.

The witnesses on liability and on damages were different.  The two witnesses from the shooting scene did not know about Watkins's family relationships.  The witnesses who knew about Watkins's family relationships did not see the shooting.

The liability and damages issues also differed.  The liability phase was to examine Urias's decision to shoot.  The damages portion would focus on the mother-son relationship.  (Cf. *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 793–794 [wrongful death damages award must be based on parents' lost comfort, society, and companionship]; see CACI No. 3921 [outlining damages analysis].)

Sasser acknowledged her testimony would have "no bearing on the issue of liability in this case, specifically, of whether or not Officer Evan Urias used excessive force" in his pursuit of Watkins.  Thus, bifurcation sped the trial and eased the burden on jurors.

Bifurcation also simplified the issues for the jury and avoided potential prejudice.  Only if the jurors found Urias used unreasonable force would they grapple with potentially charged and unfavorable evidence about Watkins's past and his relationship with his mother.

Sasser argues the damages evidence the City sought to introduce should have been excluded, thus removing any justification for bifurcation.  Sasser filed motions in limine

seeking to exclude evidence Watkins was affiliated with a gang and had criminal convictions. The City said one of Watkins's recent convictions was for battering his mother. It argued this incident, and the gang evidence as well, was relevant to Sasser's claimed damages for loss of society and comfort. The court tentatively denied the first motion concerning gang evidence and granted the second motion concerning Watkins's convictions. The court correctly recognized, however, that excluding the convictions would not necessarily keep out the facts surrounding Watkins's alleged battery of his mother. Sasser's motions in limine thus did not negate the basis for bifurcation.

Sasser claims the court acknowledged bifurcation would not serve judicial economy. Yet the decision plainly saved time, promoted judicial economy, and gave the jurors a clearer focus on the issues of liability.

Sasser also argues bifurcation prejudiced her because it prevented the jury from getting to "meet the decedent," from learning she was Watkins's mother, and from establishing she suffered harm. Sasser did not present these arguments to the trial court in opposing the City's bifurcation motion. These arguments do not demonstrate the court abused its discretion when it granted the motion.

The prosecution told the trial court it found no state case directly concerning bifurcation in a police shooting case. Indeed, we too are unaware of such a precedent.

The prosecution did cite federal cases bifurcating similar issues. (See *Estate of Diaz v. City of Anaheim* (9th Cir. 2016) 840 F.3d 592, 601–603; *Hirst v. Gertzen* (9th Cir. 1982) 676 F.2d 1252, 1256, 1261–1262.) Federal authority is pertinent here. (See Legis. Com., com. on Sen. Bill No. 201 (1971 Reg. Sess.)

8

reprinted at 19A West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1048, p. 310 [California's severance procedure conforms in substance to federal severance procedure].)

Sasser cites no case condemning bifurcation in a wrongful death or police shooting case. To no avail, she quotes a dictum from *Cohn v. Bugas* (1974) 42 Cal.App.3d 381, 385–386, arguing bifurcation was unavailable over her objection because the nature of this case was such that she needed to prove damages to establish liability. This argument is incorrect. *Cohn* affirmed a trial court's decision to bifurcate, as we do here: we follow the *Cohn* holding. *Cohn* also gave an example of a situation where bifurcation would be improper, but that example concerned a legal malpractice case, which is fundamentally different from the situation here. The *Cohn* case explained this point. (*Ibid.*) Sasser does not say why she needed to prove damages to establish liability, and indeed she did not.

Bifurcation was sensible. It was not an abuse of discretion. Nor was it evidence of trial court bias against Sasser or her attorneys.

### III

Sasser argues reversal is required because the trial court let the jury deliberate on instructions and on a verdict form containing legal error. She says the instructions for negligence (derived from CACI No. 400) and battery by a peace officer (derived from CACI No. 1305), together with the related verdict form, should have referred to harm the City caused *to Watkins*. Instead, she claims they wrongly referred to harm caused *to her*.

Sasser's argument fails. Any errors were harmless.

We describe how this situation came to pass.

9

The parties agreed on the jury instructions and the verdict form and jointly submitted both to the court. The court submitted the case for the jury's deliberation, without objection.

On the second day of jury deliberations, Sasser filed a motion to modify the verdict form to remove the questions referencing "harm," or alternatively to reopen the case to allow her to establish Sasser was Watkins's mother. Sasser also asked the trial court to take judicial notice of her complaint. The court denied the motions. The parties have not transcribed the court's rulings and the related trial court argument for this appeal. It appears at this point Sasser's lawyers had not yet realized, however, that the instructions and verdict form should have referred to harm caused *to Watkins*. Rather, Sasser concedes she sought relief upon realizing she had not introduced evidence showing she was Watkins's mother.

Sasser did not mention instructional error to the trial court until the third day of jury deliberations. Sasser's attorney Jones orally raised the issue. Plowden, the City's lawyer, eventually conceded the error but argued the City would be prejudiced by changing the case at such a late hour. The court initially denied Sasser's motion.

There was a recess immediately after this ruling, and then a readback to the jury. After the readback, the jury returned to the jury room for further deliberation.

On its own motion, the court reopened discussions on Sasser's motion. The trial court reversed its ruling, opting now to provide revised instructions and a new verdict form to the jury.

But then the jury returned its verdict. This happened 10 minutes after the readback.

When Jones initially identified errors, the court could not give the jury the revised verdict form Sasser proposed. After reviewing it, Plowden and the court discovered Sasser's proposed form contained other errors: it omitted the "yes-no" answers to one question, and a caption was erroneous.

The jury returned its verdict as counsel and the court were discussing changes needed to the form.

Sasser cannot prevail on these arguments, for the asserted errors were harmless: they involved topics the jury never reached. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570, 573–574 [instructional error subject to harmless error analysis]; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1233, 1244 [defective special verdict subject to harmless error analysis].) Instructional errors are prejudicial when it is reasonably probable they affected the verdict. (*Soule*, at pp. 580, 581–583 & fn. 11.)

There was no prejudice because the jury never considered the erroneous parts of the instructions and verdict form. The jury reached only the first two questions on the verdict form: "Did Evan Urias intentionally touch Kenney Watkins?" and "Did Evan Urias use unreasonable force while in pursuit of Kenney Watkins?" The form instructed that, if they answered "no" to the second question, the jurors were to stop and were to answer no further questions. The verdict form shows the jury answered no and stopped after this second question.

The two questions the jury answered tracked the CACI verdict form (VF-1303) and appropriately referred to Urias and Watkins. Sasser does not contest this point.

The jury thus never reached the errors that Sasser says appeared in questions four, six, and eight on the form. These

11

questions addressed whether Urias's use of force caused harm to Sasser, and whether Urias's or Watkins's negligence caused harm to Sasser.

We presume the jury obeyed the judge's instructions to consider each question separately, to follow the form carefully, and to answer the questions on the verdict form in the order they appear.  (See *Cassim*, *supra*, 33 Cal.4th at pp. 803–804.)

No sign suggests the claimed errors affected the case.  The jury did not ask any questions about harm suffered by Watkins or Sasser, or any questions about Sasser at all.  This was natural, for the focus of the trial was on the shooting of Watkins and whether Urias's use of force was reasonable, not on whether Watkins had died or whether Watkins's death did or did not harm Sasser.

Sasser argues that, even if the errors were harmless, they still warrant reversal because, when combined with other errors, the effect is prejudicial.  The effect of the errors here, however, was zero, no matter how one considers the question.

In sum, it is not reasonably probable the outcome at trial would have been different had the jury instructions and verdict form been different.  The claimed errors do not warrant reversal.  Nor do they show judicial bias or misconduct.

IV

Sasser impugns trial court evidentiary rulings.  She suggests the trial court erred in 14 ways.

We review evidence rulings for abuses of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  We reverse only if the appellant shows the court clearly exceeded the bounds of reason under the circumstances and a more favorable result was reasonably probable absent error.  (*Arave v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 533 (*Arave*).)

We examine each of these 14 asserted errors, listing them A through N. We conclude there were no abuses of discretion.

A

Sasser asserts the trial court erred and revealed its lack of impartiality in the way the court handled a question during Sasser's examination of her first witness: Urias. Sasser complains the court sustained its own objection. The court action, however, was conventional and reasonable.

Trial courts may exclude irrelevant evidence on their motions. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1239 (*Sturm*); see also Super. Ct. L.A. County, Local Rules, rule 3.135 [court on its own motion may exclude irrelevant evidence].)

Sasser's attorney Curls called Urias as his first witness. Curls began by asking Urias to recount his 11 years of career experience. Urias described his first assignment. Then Urias said his second assignment was working in an "undercover capacity conducting confidential investigations for the Los Angeles Police Department." Curls asked what that meant. Urias replied, the "investigations are confidential in nature and I'm not at liberty to state what they were." Curls said, "Your Honor, I ask the court to instruct the witness to answer the question."

The court asked counsel to come to sidebar, where this exchange followed:

"THE COURT: YOU'RE OBJECTING TO THE QUESTION BASED IN RELEVANCE?

MR. PLOWDEN: YES, YOUR HONOR.

THE COURT:  I ALWAYS NEED AN OBJECTION FOR YOUR RECORD."

Plowden stated a relevance objection, and the court asked Curls, "How is this relevant to any disputed material fact in your case?"  Curls replied, "I'm going to ask the officer's history and he's not going to answer the question."  The court ruled: "Sustained."

The court's actions were proper.  Curls asked about a remote six-month detail from Urias's past career, which had no bearing on the issue at trial.  Urias cited confidentiality; Curls asked the court to order Urias to override the confidentiality concern and to answer the question.  The court saw the speedy and fair way to resolve the dispute was to avoid getting bogged down in a potentially complex confidentiality issue by ruling the matter lacked relevance, which it did given its remoteness and short duration.

It is potentially momentous for a court to order disclosure of an unfamiliar confidential or private matter.  The parties had done nothing to anticipate or to explain the details of this issue to the court.  The issue arose suddenly and was unknown to the court.  If the court orders the cat out of the bag and the privacy concern turns out to be valid, the damage can be hard or impossible to repair.  So the trial court decided to discuss at sidebar, outside of the jury's hearing.  The whole matter seemed irrelevant to the trial court, which said so by raising the question of relevance on its own motion.  When the court asked Curls to explain why his question was relevant, Curls offered no cogent response.  So the court sustained its own relevance objection, elided the potential privacy morass, and kept the trial moving.

In sum, this court action was a practical and proper way to steer around a time-consuming irrelevancy. The court's conduct was proper, not biased.

B

Sasser argues the trial court improperly barred her attorney from asking leading questions of Timothy Williams, who was the plaintiff's police practices expert. Citing *Chula v. Superior Court* (1952) 109 Cal.App.2d 24, 38 (*Chula*), Sasser notes leading questions are always permissible with experts. Sasser also argues the judge displayed bias by letting the City lead its experts.

We reach three conclusions about the trial court's handling of Williams's testimony. First, the trial court initially made a mistake of law, but the court later corrected this mistake. Second, the mistake was harmless. Third, it was not an abuse of discretion to make a mistake and then fix it.

The topic here is the proper use of leading questions. The general rule is that, *unless special circumstances otherwise require*, leading questions are not proper during direct or redirect examination and generally are reserved to cross- and recross-examination. (Evid. Code, § 767, subd. (a).) An authoritative statutory note following section 767 of the Evidence Code, however, generally *permits* leading questions on direct examination where there is little danger of improper suggestion. The exception in this statutory note expressly permits leading questions in a number of circumstances, including when examining expert witnesses. (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) reprinted at 29B pt. 2B West's Ann. Evid. Code (2019 ed.) foll. § 767, p. 160.)

So it is generally proper to use leading questions with an expert witness.

This rule about leading experts was the law before the Legislature enacted the Evidence Code in 1965. (See *Chula*, *supra*, 109 Cal.App.2d at p. 38.) The 1965 statutory note itself announced it merely "continues the present law . . . ." (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) reprinted at 29B pt. 2B West's Ann. Evid. Code (2019 ed.) foll. § 767, p. 160.)

The trial court was wrong when it faulted Curls for using leading questions with his expert. But the court came to realize its own error. Suddenly, in the course of this witness's testimony, the trial court corrected itself, called counsel to sidebar, and said, "A light bulb just went on. You can lead a witness." After concluding the conference, the judge immediately told the jury, "Bad call. That question [Curls's question] is allowed."

Our second conclusion is that the trial court's self-corrected error was harmless. The court initially sustained a leading objection when Curls examined Williams. The court also told Curls to ask non-leading questions of the witness. Curls later argued he was allowed to ask leading questions with expert witnesses. After this argument, the trial court sustained another leading objection and then corrected itself, as described.

Once the light bulb went on, the trial court was correct and consistent on this score. Sasser cites no incident after this point in which the court sustained a leading objection during an expert's examination.

Sasser does not argue the court's initial position on leading questions prejudiced her. Our review confirms the court's rulings did not meaningfully hamper Curls's presentation. Sasser got in

16

the evidence she wanted. For example, the court precluded leading questions concerning whether Urias's failure to use a public address system and to establish a perimeter fell below the standard of care. But soon after the court sustained the objections, Curls rephrased his questions and Williams did testify on those topics.

The court did not abuse its discretion by initially disallowing and then permitting leading questions of the experts. There was no prejudice, no bias, and no judicial misconduct.

C

Sasser claims the court erred by preventing Williams from offering an opinion on the ultimate issue in the case: whether the force Urias used against Watkins was unreasonable. But the court did permit Williams to provide this opinion, which Williams gave. The court's ruling was proper. (Evid. Code, § 805.)

D

Sasser complains the defense cross-examination of Williams elicited hearsay evidence from Williams. This is true. But Sasser offered no objection to this evidence and thus has no basis for complaint. (Evid. Code, §§ 353, 354.) There was no bias, misconduct, or abuse of discretion here.

E

Sasser argues the court improperly handled hearsay evidence to her detriment. But Sasser's counsel misconceived hearsay law. The trial court ruled correctly.

The issue arose on Sasser's redirect examination of Sasser's expert witness Williams. As mentioned, Williams was the retired police officer who testified Urias's shooting was below the standard of care. On redirect examination, Sasser asked Williams to read a portion of Gatison's deposition transcript to

17

the jury.  This deposition excerpt concerned whether Gatison saw Watkins turn his body towards Urias.  The City objected on hearsay grounds.

Discussion on this issue extended over three sidebar conferences that total 27 pages of transcript.

During this discussion, Sasser's counsel made three arguments for admission of his proposed hearsay:  (1) a deposition is not hearsay; (2) experts may recite hearsay; and (3) rehabilitation is not hearsay.

Sasser's three trial arguments were incorrect.  They remain incorrect on appeal.

First, Gatison's deposition was classic hearsay.  The statements at the deposition were out-of-court statements, and Williams was being asked to repeat Gatison's words for their truth:  Watkins never turned his body towards Urias.  (Evid. Code, § 1200, subds. (a), (b); 3 Witkin, Cal. Evidence (5th ed. 2020) Presentation at Trial, § 167 ["Because depositions are hearsay evidence, generally a party cannot make unlimited use of the deposition of a nonadverse coparty or a nonparty."])  Sasser's trial court argument to the contrary was in error.

Second, the 2016 *Sanchez* case barred experts from reciting case-specific hearsay.  (*People v. Sanchez* (2016) 63 Cal.4th 665, 670, 676–679 (*Sanchez*); accord, *People v. Veamatahau* (2020) 9 Cal.5th 16, 21, 25–35 (*Veamatahau*).)  The trial court cited *Sanchez* to Sasser seven times.  Sasser's counsel seemed unfamiliar with *Sanchez*, and indeed has not cited it in any of Sasser's appellate briefing.  Sasser's second trial argument on this point thus also was mistaken.

Third, in the trial court, Sasser's counsel seemed to believe that to claim "rehabilitation" is to create a categorical exception

18

to the hearsay rule.  In neither the trial court nor in her appellate briefing has Sasser explained or offered authority for this belief.

In sum, the court's hearsay rulings were correct.  There was no bias or misconduct.

F

Sasser argues that, after the court blocked hearsay from her expert Williams during Sasser's redirect examination, the court then unfairly and improperly permitted the City's police practices expert, James Katapodis, to testify to hearsay.  This argument is incorrect.  The court accurately cited and applied *Sanchez*, which Sasser's counsel continued to misunderstand.  Based on this misunderstanding, Sasser's counsel became infuriated at what he perceived to be unfair favoritism.  By law, however, counsel had no basis for complaint or indignation.

This episode unfolded during the defense case.  The City's expert Katapodis was the next witness.  The City called him to testify Urias's use of force was proper.

Before the jury and Katapodis entered the courtroom, Sasser's attorney Jones raised an issue about Katapodis's impending testimony.  Jones noted Katapodis's expert report cited an article from Police Marksman magazine titled *Why Is The Suspect Shot In The Back?*  Jones challenged this.  The court asked Plowden whether Katapodis was going to cite or quote this article during his testimony.  Plowden said no, but that Katapodis would "talk about his review of the scientific literature in the area as it relates to lag time/reaction time."  The court approved, citing *Sanchez*:  the court ruled Katapodis could say he relied on a review of the scientific literature, so long as he did not cite the article.

19

Jones said this ruling satisfied her concerns. The court asked whether there was anything else. Jones replied, "No, there is not."

This proposed testimony was permissible. (See *Veamatahau, supra*, 9 Cal.5th at p. 29 [experts may consult textbooks, treatises, or academic papers and recount the contents as background information without running afoul of hearsay rules].) Background information is permitted and differs from impermissible case-specific hearsay. (*Sanchez, supra*, 63 Cal.4th at pp. 685–686.)

The trial court's ruling was correct. The court was evenhanded and unerring regarding expert use of hearsay.

The ruling was correct, but it incensed Curls. Outside the jury's presence, Curls challenged the court's varying treatment of his expert Williams and the opposing expert Katapodis. Curls attributed the varying treatment, not to a valid legal distinction, but to the court's bias. His unfamiliarity with the *Sanchez* case, which did inaugurate a change from past practice, was unfortunate, for it apparently convinced Curls the simple explanation for the varying treatment was the court's prejudice against him and his client.

Curls then launched into a lengthy statement, telling the court its ruling was "specious" and "offensive" and the court has "not been playing fair in this case." On appeal, Sasser quotes this statement at length. During this statement, the court asked Curls to stop pointing his pen at the court and, four times, to lower his voice.

We return to this lengthy statement below. For now, we simply reiterate the court's ruling was correct and was not bias.

G

Sasser complains the court allowed the City to introduce hearsay statements from Gatison through Ubaldo Zesati, a detective who interviewed Gatison. Sasser argues the court allowed Plowden to elicit hearsay from Zesati after it had denied Sasser the same ability to introduce hearsay from Sasser's expert Williams. Sasser suggests the court was inconsistent in its rulings and the explanation is bias.

There was no inconsistency or bias. The rulings were consistent and correct. In a previous section, we analyzed and approved the rulings during Williams's redirect examination. We now do the same for the rulings during Zesati's direct examination.

In seeking to introduce the statements at issue, Plowden argued they were admissible as prior inconsistent statements, given that Gatison had been confronted with his statements at trial and had denied them. (See Evid. Code, §§ 1235, 770.) Plowden was agreeable to a limiting instruction, but Curls did not pursue this offer. (See Evid. Code, § 355 [permitting limiting instructions "upon request"].)

The court called a recess, heard argument on Sasser's objections, consulted a reference, and read portions of it into the record. The court sustained Sasser's objections to some but not all of the statements Plowden sought to introduce, depending on whether Plowden in fact had confronted Gatison with the statements. The court later allowed Curls to introduce more of Gatison's statement on cross-examination and to question Zesati about this.

Sasser's appellate briefing refrains from claiming these rulings were erroneous. Sasser also does not address the hearsay

21

exception on which Plowden relied.  To the extent Sasser argues this exchange proves the trial court was biased against her or her lawyers, this is incorrect.  The court's hearsay rulings were reasoned and evenhanded.

H

Sasser argues the court unfairly allowed Plowden to elicit hearsay during his direct examination of defense witness Detective Christopher Linscomb.  This argument is incorrect.

Linscomb's testimony is the subject of this section as well as the next two.  We sketch Linscomb's role in the case.

Linscomb works for the Los Angeles Police Department in its Force Investigation Division.  He was at the scene to investigate the shooting.  Linscomb interviewed Urias.

During Linscomb's direct examination, Curls asserted a hearsay objection to a question about Linscomb's interview with Urias.  There was a lengthy sidebar discussion and then a recess to discuss the objection and the proposed testimony.

The court ultimately allowed Plowden to ask Linscomb a single question with a yes or no answer:  did Urias "articulate facts [to Linscomb] as to why he [Urias] shot from a moving vehicle?"

Urias had testified earlier and had said that he told investigators why he shot Watkins.  Plowden told the court he wanted Linscomb simply to verify Urias indeed had said *something* to Linscomb, without revealing *what* Urias had said.

To Plowden's question, Linscomb answered simply "Yes." Linscomb did not reveal the contents of Urias's statement.

Linscomb testified Urias made a statement and did not say what the statement was.  This is not hearsay.  (See Evid. Code, § 1200; see also Wegner et al., Cal. Practice Guide:  Civil Trials and

22

Evidence (The Rutter Group 2020) ¶ 8:1042 ["The hearsay rule is not implicated where the issue is *whether certain things were said or done*, and not whether those things were true or false."].)

Because the question did not call for hearsay, the rule against hearsay did not apply. This remains true even though Plowden used the words "rehabilitation of the witness" in his argument to the court as to why the court should overrule Sasser's objection to his question.

This evidence ruling was correct. The court did not abuse its discretion in permitting this testimony by Linscomb. There was no bias or misconduct.

I

Sasser suggests the trial court showed bias by allowing Plowden to adduce evidence of a kind the court prohibited Curls from obtaining. The record does not bear out this suggestion.

The last section examined Plowden's question to Linscomb that called for the yes-or-no answer. Just before that question, Plowden asked Linscomb about "babysitters." Plowden was trying to establish the two witness descriptions of the shooting were consistent with each other. These two witnesses were Urias and Gatison. Plowden further sought to prove this consistency was not the result of Urias learning of Gatison's account and then tailoring his statement to mesh with Gatison, or vice versa. In short, Plowden's goal was to show the two consistent witness statements were completely independent of each other, and thus their consistency was probative of their truth. Plowden thus asked Linscomb whether Urias—or the police "babysitters" who were isolating Urias from contact with other witnesses—had access to Gatison's description of the shooting.

The court made three rulings during this portion of Linscomb's testimony. Two rulings were in Sasser's favor. The one ruling against Sasser was that a question was not compound. This ruling was correct. Sasser does not mention this ruling in her opening brief.

In short, this part of Linscomb's examination reveals no error or bias.

J

Sasser argues the trial court committed reversible error when it limited Curls's cross-examination of Linscomb to matters arising within the scope of Linscomb's direct examination. We review for abuses of discretion. (*People v. Foss* (2007) 155 Cal.App.4th 113, 124, 126.)

Plowden's direct examination of Linscomb was brief: less than five transcript pages. We reiterate Linscomb's role. On behalf of the City, Plowden called Linscomb to testify the witness statements from the two surviving eyewitnesses to the shooting— Urias and Gatison—were independent in that neither one had influenced the other, and that these independent accounts were consistent with each other. In other words, according to Linscomb there had been no opportunity for one eyewitness to hear or read what the other said and to tailor his own account to match. According to Linscomb, his goal had been to have Urias's supervisor isolate Urias and "basically babysit" him until Linscomb got Urias's statement.

Curls raised no hearsay objections to these aspects of Linscomb's testimony. (Curls did raise an incorrect hearsay objection to a different question to Linscomb, as recounted above.)

24

On cross-examination, Curls sought to question Linscomb beyond the scope of the direct examination. For instance, Curls's first question was whether shooting from a moving vehicle violated police policy. Linscomb had not testified on this topic. The court sustained Plowden's objection as beyond the scope of the direct examination. Curls kept trying to enlarge Linscomb's testimony. The court responded consistently: it sustained 19 defense beyond-the-scope objections to Curls's questions.

Early in this process, the court called a sidebar to ask Curls, "What question did Mr. Plowden ask [Linscomb] that brings this question within the scope of the cross?"

Curls replied "I am not limited in my cross-examination to what he [Plowden] went over in his direct."

Curls's reply was legally incorrect. Cross-examination generally is limited to matters within the scope of the direct examination. (Evid. Code, §§ 761, 773, subd. (a).) Trial courts have discretion to enforce this rule. (See Evid. Code, § 772, subd. (c); *Garcia v. Hoffman* (1963) 212 Cal.App.2d 530, 536 [cross-examination scope committed to court's discretion].)

Sasser's opening brief does not defend Curls's view that "I am not limited in my cross-examination to what he [Plowden] went over in his direct." Neither does Sasser's opening brief attempt to show any of the 19 sustained objections were erroneous. A brief would do this question by question, by identifying what portion of the direct examination justified a proposed cross-examination the court wrongly ruled to be beyond the scope of the direct examination. Sasser has not engaged this issue at that meaningful level.

There was no abuse of discretion and no sign of bias or misconduct.

25

## K

The trial court similarly did not abuse its discretion in sustaining a beyond-the-scope objection during Curls's cross-examination of coroner David Whiteman.

Sasser's point here centers on a question about the cause of Watkins's death. That cause, however, was undisputed: Urias shot Watkins to death. In its opening statement the City admitted Urias shot Watkins to death.

Curls already had questioned Whiteman without limitation. Curls had called Whiteman in Sasser's case-in-chief and examined Whiteman at length. In response to Curls's earlier questions, Whiteman told the jury he performed the autopsy on Watkins. At Curls's request, Whiteman showed the jury a diagram illustrating the bullet's entry wound. He described the bullet's path through Watkins's body and how it penetrated Watkins's heart. Both sides questioned Whiteman and told the court they had nothing further. Whiteman left the witness stand.

Five days later, on September 25, 2018, Plowden called Whiteman as a rebuttal witness for the City. The main point of this rebuttal testimony was to elicit that the bullet's entry wound was oval, not circular. Whiteman explained this was consistent with the bullet entering Watkins's body at an angle rather than directly perpendicular to his skin. Plowden's goal obviously was to show the shape of the entry wound corroborated Urias's testimony that Urias fired only after Watkins began turning his body and was beginning to aim at Urias. Plowden wanted to fight the idea Urias, without justification, simply shot the fleeing Watkins squarely in the back.

In this rebuttal testimony, Whiteman did not discuss the *cause* of death, which was Urias's bullet.

Curls nonetheless began his cross-examination of Whiteman by asking him to state the cause of death. Plowden objected this question was beyond the scope of the direct examination. The court sustained this objection. There was no other cross-examination.

This ruling was proper for the same reasons as set forth in the previous section of this opinion. Moreover, the ruling had no potential for prejudice, because the defense repeatedly conceded the cause of death: Urias shot Watkins to death.

## L

Sasser complains the court allowed Plowden to ask a beyond-the-scope question during his redirect examination of Katapodis. This question was within the scope and not beyond it. The ruling was proper.

As mentioned, the City called its expert Katapodis to testify Urias's shooting was justified.

From the start, one of Sasser's themes had been Urias should have waited for backup and set up a perimeter instead of handling the situation by himself. On direct examination, Katapodis rebutted this aspect of the plaintiff's case by explaining why Urias's tactics were sound.

Curls's cross-examination challenged Katapodis on whether Urias was right to act alone or whether Urias should have waited for backup to arrive. Curls pressed Katapodis on this topic: "[W]hat about these facts justified the officer not waiting for backup?"

Plowden's redirect examination responded to Curls's cross-examination on this point. Plowden asked Katapodis about the times that, in response to a similar call, it would take for backup police to arrive. Curls objected the question went outside the

scope.  The court overruled the objection.  Katapodis recounted how he had called for backup, but the other officers were all at a murder scene and it "seemed like it took forever" for backup to arrive.

District's cross-examination was suggesting Urias acted improperly by failing to wait for backup. The City's redirect responded directly to that point with evidence that waiting for help could be unreliable and impractical.

The redirect examination was within the scope of the cross-examination, which was within the scope of the direct examination.  This ruling was proper and was not biased.

M

Sasser claims the trial court ruled incorrectly and revealed bias when, after initially allowing Curls to use animations during his opening statement, the court got angry with him and reversed course.  This claim is mistaken.  The ruling was proper.

During pretrial discussions, the court asked about the slides the parties planned to show during their opening statements.  Plowden reported his slide show was an exhibit, he shared it with opposing counsel before trial, and he had modified it in response to Curls's objections.  The court asked Curls when he would give his slide show to the defense.  Curls asked for two days, as he anticipated jury selection would take at least that long.  The court allowed this and ordered Curls to disclose the show by 8:45 a.m. on September 19.

Curls did not comply.  His failure to obey led to a hectic hearing on September 19, as follows.

On the morning of September 19, Curls was late to court. He did not bring his slide show.  He promised it would be

28

delivered shortly. The trial court responded: "It's been a little loosey-goosey in this trial, we've got to tighten it up a little."

The jurors entered; the court and counsel completed jury selection, and the court gave the jury its initial jury instructions.

When the court finished instructing the jurors, it was nearly time for the noon recess. By now Curls's trial team had gotten his slide show to court in an electronic format. The court had ordered Curls to supply a paper copy of his slide show for a possible appellate record. Curls, however, did not comply with this order: he had no paper copy.

By this time, it was 12 minutes to noon. The court tackled issues with Curls's proposed slide show. This task occupied 33 transcript pages and went 30 minutes into the noon recess as the court labored to be ready for opening statements when the jurors returned from lunch.

Plowden reviewed Curls's slide show and had many objections. The court considered these at the earliest opportunity. The court initially was inclined to allow Curls to use the animated slides the parties called "four," "five," and "six." But as the rushed conference progressed, the court came to the view Curls had placed considerable material in his proposed show that was not on his exhibit list or in his trial binders. The court ultimately excluded these animations from the slide show on this basis. The court said this conduct violated local rule 3.97 about proper trial preparation and procedure. (Super. Ct. L.A. County, Local Rules, rule 3.97.)

Sasser does not challenge this conventional and venerable rule. Trial courts undeniably have discretion to limit the use of visual aids in opening statements. (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1286.)

Curls failed to submit his slide show as an exhibit, did not get opposing counsel's agreement, and sought court approval only at the last possible moment, over opposing counsel's many objections. He violated the court's order for disclosing the presentation. Disallowing portions of this tardy slide show was neither error nor bias.

N

Sasser argues the court allowed Katapodis to "testify from a document that had not been previously produced in discovery." This argument is misplaced. Plowden sought to show the jury a document on the overhead projector. On its own motion, the trial court interrupted and asked if Curls objected. Curls did object. The court *sustained* Curls's objection and barred Plowden from displaying the document or entering it into evidence. After the court ruled in Curls's favor, Curls made no further objections on this topic. Sasser does not give a basis for condemning this court conduct. This court ruling was not error or an abuse of discretion. It is not evidence of bias.

\* \* \* \* \*

In sum, the trial court originally made a mistake about the use of leading questions with experts. But then, as the court put it, the light bulb went on: the court corrected its error. There was no prejudice and, in the final analysis, no abuse of discretion. Apart from this one lapse, the trial court's evidentiary rulings were sound. There is no evidence of judicial bias or misconduct.

V

Sasser argues we should grant her a new trial because the trial court was biased against her and her counsel. She mainly relies on the 2006 decision in *Sturm*, *supra*, 37 Cal.4th 1218.

30

Sasser's case, however, is nothing like *Sturm*. We recount the *Sturm* decision and then apply it to this record.

A

*Sturm* was a capital murder case. The Supreme Court affirmed the convictions but reversed the sentence of death. The problem was the conduct of the trial court during the sentencing trial, which fairly can be called outrageous. There were four components to this outrageous judicial misconduct.

First, the judge falsely told the jury the defense theory had no legal merit. Defendant Sturm's defense against the death penalty was that heavy cocaine use negated his capacity to premeditate the murders. Yet the trial judge told the jury in the penalty phase the issue of premeditation was " 'all over and done with.' " (*Sturm*, *supra*, 37 Cal.4th at pp. 1230–1232.) The judge's baseless comments effectively demolished the trial defense on the merits. That error was grave. (*Ibid*.)

Second, the trial judge repeatedly belittled the defense attorney in front of the jury. (*Sturm*, *supra*, 37 Cal.4th at pp. 1233 & 1234.) The court suggested the defense lawyer was trying to "sneak" things by the court and the lawyer was so bad he needed to go back to law school. (*Id*. at pp. 1235–1236 & 1242–1243.)

Third, with the jury present, the judge jeered at the two key defense expert witnesses. (*Sturm*, *supra*, 37 Cal.4th at p. 1240.) Concerning one defense expert, the judge manifested indifference to her testimony and conveyed the message her testimony was inconsequential. (*Id*. at p. 1239.) The judge even answered some questions for this witness himself, reinforcing the message the questions were so trivial the judge himself "was able

to answer them without possessing the particular expertise of the witness." (*Ibid.*)

Concerning the other defense expert, the judge sneered that the government funding for the witness's research was contributing to the federal deficit and that testimony about the research would be " 'very depressing and we will need cocaine.' " (*Sturm*, *supra*, 37 Cal.4th at pp. 1233 & 1238.) These comments disparaged the witness. They also "conveyed to the jury that the trial judge did not take seriously the defense theory in mitigation." (*Id.* at p. 1238.)

The judge's comments about these witnesses communicated the court's "disdain for the witnesses and their testimony and therefore constituted misconduct." (*Sturm*, *supra*, 37 Cal.4th at p. 1240.)

Fourth, the judge openly favored the prosecution. He spoke to the jury about this favoritism in a way that aggravated the poison. (*Sturm*, *supra*, 37 Cal.4th at pp. 1235–1236.) The judge "communicated to the jury the message that the trial judge was collaborating with the prosecutor." (*Id.* at p. 1241.)

This confluence of misconduct prompted the Supreme Court's reversal of the judgment of death. "Although no one instance of misconduct appears to, in itself, require reversal, the cumulative effect of the trial judge's conduct requires reversal." (*Sturm*, *supra*, 37 Cal.4th at p. 1243.)

*Sturm* remains a valid due process holding. (See *People v. Peoples* (2016) 62 Cal.4th 718, 790 (*Peoples*).) Our high court has emphasized, however, that only the most extreme facts justify judicial disqualification based on the due process clause. (*Id.* at p. 788.)

32

B

This case is wholly different from *Sturm*. There are no extreme facts. The trial court here committed no misconduct. *Sturm* has no application.

In this vein, Sasser makes 12 claims.

1. Subject of trial. In advance of jury selection, the court and counsel discussed voir dire. Curls said he did not think there was any more sensitive subject matter for trial "at this season," referring to this police shooting case. Sasser complains the trial court responded, "I'm not so sure about that," noting child molestation cases also were sensitive to try.

The judge's brief statement of uncertainty, outside the presence of the jury, does not show bias against Sasser or Curls.

2. Jury Selection. Sasser did not transcribe the voir dire process for this appeal, yet argues the trial court displayed impartiality during these proceedings. She complains about a snippet of jury selection, which we cannot evaluate absent the transcript.

3. Opening Statement Slide Show. Sasser claims the judge revealed her bias when, after initially allowing Curls to use animations during his opening statement, the judge got angry with him and reversed course. We treated this issue above. To repeat, Sasser's counsel violated court orders and rules by trying, at the last minute, to include unauthorized slides in his opening slide show. The trial court's rulings were not misconduct or evidence of bias.

4. Courtroom Conduct Violations: Use of First Name.

Sasser argues the court exhibited bias by repeatedly warning Curls not to refer to Watkins by his first name only, not to make facial expressions to the jury, and not to interrupt

33

witnesses' answers.  Local court rules and conventional trial decorum, however, warranted these warnings.  The trial court's comments do not show bias.  We address the use of the first name here and the other violations in later sections.

At the outset of trial, the court emphasized the importance of following the Los Angeles Superior Court Local Rules.

The court ordered the parties, the attorneys, and spectators to adhere to these rules at all times:  otherwise they risked exclusion from the courtroom.  The court read pertinent rules on the record.

The court ordered that counsel should not "exhibit familiarity with witnesses, parties . . . or address them by use of their first names" (rule 3.96); counsel "must not repeat the witness' answer to the prior question before asking another question" and "must wait until the witness has completed the answer before asking another question" (rule 3.112); and persons in the courtroom "must not indicate by facial expression, shaking of the head, gesturing, shouts or other conduct their disagreement with or approval of the testimony . . . or other evidence" (rule 3.120).  The court added it did not want to see anyone in the courtroom "react to anything that's going on in the courtroom."

Sasser complains the trial court admonished Curls many times for referring to Watkins as "Kenney," while allowing Plowden to make the same mistake without comment.

The longstanding rule against referring to clients by their first name alone preserves trial decorum and fairness.  We ask jurors to avoid deciding cases on an emotional or subliminal basis.  Avoiding terms of familiarity and endearment is a basic element of standard courtroom formality and fairness.

34

In violation of the court rule, Curls referred to Watkins by his first name alone more than a *dozen* times with the first witness. When Curls repeatedly broke the rule, the court did not berate him. On most occasions, the court simply corrected him by saying "Mr. Watkins."

After the first witness, Curls largely complied with the rule. The trial court corrected him once six days later during Curls's examination of a defense expert. The court also corrected Urias twice when Urias made the same mistake during his testimony.

Once, the trial court failed to correct Plowden when he referred to "Kenney." The judge also failed to correct Curls five times.

The trial court did not exhibit bias when enforcing this rule. This was not judicial misconduct.

5. Courtroom Conduct Violations: Interrupting Witnesses.

Sasser suggests the trial court dealt harshly with Curls when Curls sought to head off answers by witnesses.

The transcript shows Curls interrupted witnesses throughout the trial, in violation of Local Rule 3.112. The trial judge asked Curls not to interrupt, reminded him of the pertinent rule, and intervened to allow witnesses to respond fully. This was not bias or prejudice.

The trial court similarly admonished witnesses not to answer questions until the questions were completed and to speak more slowly to allow counsel to object.

6. Courtroom Conduct Violations: Gestures and Facial Expressions.

Sasser complains the trial court criticized Curls for gesturing and making facial expressions the jury could see. On

several occasions, either in sidebar conferences or outside the presence of the jury, the court indeed noted Curls was making facial expressions, asked him to stop, or asked him to keep a poker face.

It was not bias to demand professionalism. Convention and the local rules both require courtroom decorum. (Super. Ct. L.A. County, Local Rules, rule 3.120.) The court acknowledged that Curls's cocounsel Jones and opposing counsel Plowden remained poker faced. The trial court did not display bias or engage in misconduct by enforcing this rule.

7. Interrupting Counsel. Sasser argues the trial court interrupted Curls's questioning for petty reasons and struck portions of his direct examination, seemingly to distract and discredit Curls before the jury.

Trial judges have broad discretion to guide litigation, including considerable discretion in the realm of witness examination. (*Arave, supra*, 19 Cal.App.5th at p. 543; see also Evid. Code, § 765, subd. (a) [court shall control the mode of interrogation].)

The trial court did occasionally strike comments by Curls that were extraneous to any question. The court told Curls to ask the next question. One time it commented Curls made a statement, not a question; one time it said the court needed a question, not a statement. Several times the court reminded Curls of the court's earlier request that counsel not ask whether the witness understands the question.

The record also shows the trial court inserted itself in examinations by both sides throughout the trial. It seems the court regularly did this to clarify questions and answers for the jury and on behalf of a clearer record. This was not improper.

(See *People v. Carlucci* (1979) 23 Cal.3d 249, 255 [trial court's duty is "to assure that ambiguities and conflicts in the evidence are resolved insofar as possible"].)

Plowden did object more than Curls, and this broke up Curls's examinations. At one point, Plowden defended his objections, arguing the jury was being "bombarded with unintelligible, improper questions that call for hearsay." The trial court recognized the disruption the objections caused: it allowed Plowden a standing objection on two issues "so Mr. Curls' examination is not interrupted." Later, during a recess, the judge asked the parties to raise any other issues with Sasser's expert witness "[s]o we don't chop the exam up any further." These comments and actions contradict Sasser's claim the court sought to distract and discredit Curls before the jury.

The trial court's actions were not biased or evidence of judicial misconduct. (See *People v. Snow* (2003) 30 Cal.4th 43, 82, 77–78, 85 (*Snow*) [no judicial bias warranting reversal where, among other things, trial court interrupted questioning with various requests for clarification and admonitions to avoid repetition]; *Arave, supra*, 19 Cal.App.5th at pp. 537–539, 542 [interrupting counsel's questioning, directing counsel to allow witnesses to finish their answers, and directing counsel to "cut to the chase" in questions did not demonstrate bias].)

8. Sua Sponte Objection Favoring the Defense. We already have reviewed Sasser's complaint about this issue. We repeat our conclusion the court's actions were proper.

9. Inconsistent/Incorrect Rulings. Sasser argues the trial court showed bias through inconsistent and incorrect rulings that favored the defense. We have addressed most of these rulings already and note that continuous rulings against a party do not

37

establish bias. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.) When rulings are proper, as they were here, a consistent pattern is logically explained by counsel's flawed decisionmaking, not by wrongful judicial conduct.

We add two points.

First, Sasser complains the trial court, at sidebar, told Plowden it was inappropriate for him to contradict the court after the court had ruled in his favor. Plowden did this twice: Curls objected; the court overruled the objection; and Plowden told the jury, "Mr. Curls is right." The second time Plowden did this, the court called a sidebar and asked why Plowden was making these statements. Plowden offered no reason: he remained silent. The court told Plowden his statements were inappropriate and said "don't do it again." Plowden said "Okay." The court said "Okay. Thank you." Curls said nothing.

Sasser does not argue this conduct was legal error or an abuse of discretion. Plowden's statements, in effect, told the jury the court's rulings were wrong. The court's rulings, however, appear to us to be correct. Plowden's comments could tend to undermine the court's authority, and for faulty reasons to boot. Plowden's comments to the jury were incorrect and extraneous. The court's action does not show bias.

Second, Sasser claims the trial court allowed the City but not Sasser to use demonstrative evidence that previously had not been produced. This claim is mistaken, as the trial court consistently disallowed this material. We have covered this ground already. The court precluded Sasser from publishing material to the jury in Sasser's tardily-disclosed opening statement presentation. In the other excerpt Sasser cites, the court similarly precluded the City from publishing material the

38

City had not disclosed as an exhibit.  Later in the trial, the judge prevented the City from introducing additional material it had not disclosed.  The court's rulings were consistent and showed no bias.

10.  Admonishing Spectators.  Sasser argues the court's bias is evident from its admonitions to people Sasser asserts were spectators of color.  The record does not support this charge of bias.

Trial courts have broad power to regulate their courtrooms. (*People v. Woodward* (1992) 4 Cal.4th 376, 385.)  Trial courts must monitor spectators' facial expressions and behavior to ensure audience reactions do not sway the jurors.  (*People v. Chatman* (2006) 38 Cal.4th 344, 365.)  Trial judges are free to ask spectators to leave if they persist distracting from the serious and demanding work at hand.

The trial court consistently warned spectators about mandatory court rules.  These rules included turning off phones, keeping a poker face, not talking during proceedings, and not filming.  The court also cautioned it would ask rulebreakers to leave.  The court repeatedly stated visitors were welcome as long as they followed the rules.  The judge made nearly all of these warnings outside the jury's presence.

Some spectators did cause problems.  The court used descriptive terms to identify these people:  two observers who "had the same or similar t-shirts," "the woman with the big hoop earrings,"  the "lady in the back on her cellphone texting," the "gentleman . . . with the beard," the "gentleman with the red shirt," the "gentleman with the earphones on," "the lady in the first row in the red shirt with the bun on top of her hair," and "the lady in the white shirt in the front row."

One time, the trial court said it was distracted by "the lady with the yellow hair" who was talking while court was in session. The judge admonished her, the woman apologized, and the judge thanked her for apologizing. The court later referred to this person as "the lady with the blond hair." The court did not ask her to leave.

Sasser argues that to identify this person of color as "the lady with the yellow hair" was "hurtful and embarrassing" and was an example of "horribly unprofessional" conduct.

The court did exclude one spectator for violating court rules. Outside the presence of the jury, the judge asked the spectator with the "hoop earrings" to leave the courtroom because she had been talking during the proceedings. As the spectator was leaving, she called the judge "racist" and said the judge clearly had a problem "with people of a certain color." The court later put details of this incident on the record.

The record shows this spectator violated the rule against talking in court. Sasser does not argue otherwise. Shortly before this incident, a detective in the courtroom had reported this woman was conversing with others and was "texting quite a bit." The court made a record of the incident. The transcript reports the detective said the excluded spectator was "female black."

Sasser does not argue the judge's warnings to spectators were unwarranted. Instead, she asks us to conclude from the transcript and from an extra-record social media post that the trial court harbored bias against people of color.

The transcript does not suggest the spectators' race, ethnicity, national origin, or the like, save for the one spectator the court ordered to leave. The transcript also does not suggest the trial court's tone was unsuitable. The transcribed words of

40

the court's warnings were evenhanded. The one time the court excluded an audience member appears to have been warranted. Local rules prohibit talking and texting in the courtroom while court is in session. (Super Ct. L.A. County, Local Rules, rule 3.42 ["Persons in the courtroom must not talk, read papers, chew gum, eat, or use a cell phone, while court is in session."].)

These acts were within the court's power to regulate the courtroom and do not demonstrate bias.

11. Armed Bailiffs. Without pointing to anything in the record, Sasser asks us to conclude the trial court was impartial because armed bailiffs appeared for the reading of the verdict. We reject this conclusion from this unsupported claim.

12. Counsel's Charge of Bias. Near the end of Sasser's case-in-chief, after the trial court ruled against Curls on a hearsay objection, Curls made a record outside the jury's presence, as follows. He said the court was "making faces" the jury could see while he questioned witnesses. Curls claimed the court was "rolling [her] eyes," "throwing [her] head around," and "spinning around with all the dramatics" that she had asked counsel to avoid. The court responded it was doing no such thing and called the jury back into the courtroom.

The next day, before trial resumed and after counsel and the court had resolved another hearsay issue, Curls said he had a further objection. The court perceived that Curls pointed a pen at it, noted "there was some escalation in this court" the day before, and asked Curls to "maintain a professional stance here." Curls then launched the lengthy statement we mentioned earlier. Curls repeated the claims he made the day before regarding the judge's facial expressions. Curls also challenged what he perceived to be the inconsistency in the court's hearsay rulings.

41

He said it was clear the trial court had a problem "either with this case or with the plaintiff's representation in this case, neither of which are acceptable." He charged that the judge was "not playing fair in this case and I'm not going to sit for it anymore."

The trial court asked if Curls had further argument, then explained its hearsay ruling, and further explained this ruling had been the same throughout trial. The court declined to respond to Curls's charge of bias at that time.

After the jury reached its verdict, the court addressed the charge of bias. The court's response was lengthy. The court described Curls's behavior, including how he shouted at the court. The court explained why it waited to respond to his accusations. Then the court denied the accusations.

The transcript shows a confrontation between plaintiff's counsel and the trial judge. It shows counsel felt compelled to make a record of perceived judicial bias. It also shows the trial court rejected counsel's characterization of the court's behavior and rulings.

C

We review claims of judicial misconduct on the basis of the entire record. (*Peoples*, *supra*, 62 Cal.4th at p. 789.)

The trial court started the case complimenting all counsel on their work and how they were "in very good shape for trial."

The record at times certainly does reveal friction between the trial court and counsel. But it also shows the trial court being courteous to Curls and Jones, considerate of Sasser, and cordial to all counsel.

The trial court was strict with all counsel. The court expected Plowden to adjust his schedule and other cases to

accommodate the trial. The court cut Plowden off. It admonished Plowden in front of the jury for speaking objections. The court corrected Plowden on the proper procedure for impeaching a witness. The court admonished Plowden for being unprofessional.

The trial court told counsel for both sides to keep their voices down. The court was vexed when both lawyers failed to fill trial days with witnesses. The court commented when they were late and when they had not prepared exhibits as ordered.

The trial court grew frustrated with Curls at times, particularly when he violated court orders or court rules. As discussed above, the transcript shows Curls violated many local rules, over and over, despite the court's insistence the rules be followed. At times, Curls also appeared to disregard the court's requests that he not argue matters his cocounsel argued, argue matters after the court had ruled, shake his head when he disagreed with opposing counsel, and repeat witnesses' answers before asking his next question.

Curls similarly grew frustrated at times.

Friction between the trial court and counsel is not unusual in an intense trial. (See *Snow*, *supra*, 30 Cal.4th at p. 78.) Further, it is within the court's discretion to rebuke lawyers— even harshly—when they ask inappropriate questions, ignore the court's instructions, or otherwise engage in improper behavior. (*Ibid.*)

The trial court's comments and treatment of Curls and other trial participants do not show bias warranting a new trial. (See *Snow*, *supra*, 30 Cal.4th at pp. 78–79 [trial court's contentious exchanges with counsel, harsh language, and occasional impatience with repetitive and vague questions did not

amount to an unconstitutional display of judicial bias]; *Arave*, *supra*, 19 Cal.App.5th at p. 539 [trial court's "expressions of frustration at counsel's use of trial time" did not warrant new trial].)

This case is nothing like *Sturm*, *supra*, 37 Cal.4th 1218. Recall, there the trial court made a false statement that destroyed the defense's entire theory of the case. The court mocked the defense lawyer's competence in front of the jury. The court ridiculed two key defense witnesses. And the court communicated to the jury that the court had openly allied itself with the prosecution. This case bears no resemblance to *Sturm*.

## DISPOSITION

We affirm the judgment and award costs to respondents.


WILEY, J.



We concur:



GRIMES, Acting P. J.



STRATTON, J.

44